*This opinion is subject to revision before final publication in the Pacific Reporter*

**2024 UT 21**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

LEAGUE OF WOMEN VOTERS OF UTAH, *et al.*,*
*Appellees & Cross-Appellants*,

*v.*

UTAH STATE LEGISLATURE, *et al.*,*
*Appellants & Cross-Appellees*.

No. 20220991
Heard July 11, 2023
Supplemental Briefing Received August 1, 2023
Filed July 11, 2024

On Consolidated Appeal of Interlocutory Order

Third Judicial District, Salt Lake County
The Honorable Dianna M. Gibson
No. 220901712

Attorneys*:

Troy L. Booher, J. Frederic Voros, Jr., Caroline A. Olsen,
David C. Reymann, Kade N. Olsen, Salt Lake City, Mark P. Gaber,

---

* Additional Appellees/Cross-Appellants: Mormon Women for Ethical Government, Stephanie Condie, Malcolm Reid, Victoria Reid, Wendy Martin, Eleanor Sundwall, and Jack Markman.

Additional Appellants/Cross-Appellees: Utah Legislative Redistricting Committee, Senator Scott Sandall, former Representative Brad Wilson, and Senator J. Stuart Adams. Lt. Governor Deidre Henderson is named as a defendant in this case, but did not participate in this appeal.

Additional attorneys for *amicus curiae*, in support of Appellees/Cross-Appellants: John Mejia, Salt Lake City, for American Civil Liberties Union of Utah; Jonathan Topaz, Dayton

(continued . . .)

Aseem Mulji, Washington, D.C., Annabelle Harless, Chicago, Ill., for appellees and cross-appellants

Victoria Ashby, Robert H. Rees, Eric N. Weeks, Tyler R. Green, Salt Lake City, Taylor A.R. Meehan, Frank H. Chang, Arlington, Va., for appellants and cross-appellees

---

JUSTICE PETERSEN authored the opinion of the Court, in which CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE PEARCE, JUSTICE HAGEN, and JUSTICE POHLMAN joined.

---

Campbell-Harris, Casey Smith, Adriel I. Cepeda Derieux, N.Y.C., N.Y., for American Civil Liberties Union Foundation; Lisa Watts Baskin, Salt Lake City, Joseph E. Sandler, Washington, D.C., for Ballot Initiative Strategy Center; Alan L. Smith, Salt Lake City, Derek S. Clinger, Madison, WI, for Professor Bertrall Ross; David R. Irvine, Bountiful, Dax Goldstein, L.A., Cal., Zack Goldberg, N.Y.C., N.Y., for Bipartisan Former Governors Michael F. Easley, William Weld, and Christine Todd Whitman; Joshua Cutler, Salt Lake City, Michael C. Li, Yurij Rudensky, Douglas E. Keith, N.Y.C., N.Y., for the Brennan Center for Justice at N.Y.U. School of Law; Janet I. Jenson, Salt Lake City, Theresa J. Lee, Cambridge, Mass., for Professor Charles Fried; Christine Durham, Salt Lake City, for Common Cause; Nathan D. Thomas, Elizabeth M. Butler, Salt Lake City, for Jennifer Wilson; J. Tayler Fox, Salt Lake City, Robert A. Atkins, Pietro Signoracci, Jonathan Hurwitz, Melina Meneguin Layerenza, Jeremy Allen-Arney, Arielle McTootle, N.Y.C., N.Y., for Political Science Professors; Julie J. Nelson, Skylar Walker, Millcreek, for Rural Utah Project, Ann Leppanen, Steve Cox, Shaun Dustin, and Kenneth Maryboy.

Additional attorneys for *amicus curiae*, in support of Appellants/Cross-Appellees: Dallin B. Holt, Phx., Ariz., for the Honest Elections Project; Matthew Petersen, Haymarket, Va., for Representatives Blake Moore, Chris Stewart, John Curtis, and Burgess Owens; Stanford E. Purser, Solic. Gen., Daniel R.S. O'Bannon, Salt Lake City, for Governor Spencer J. Cox.

Additional attorneys for *amicus curiae*, in support of neither party: Darcy M. Goddard, S. Spencer Brown, Salt Lake City, for Utah Association of Counties.

JUSTICE PETERSEN, opinion of the Court:

## INTRODUCTION

¶1    This case presents a question of first impression involving the interpretation of two provisions of the Utah Constitution.

¶2    The first constitutional provision involved in this appeal is the Initiative Provision of article VI, subsections 1(1)(b) and (2), which vests in the voters of Utah the power to pass legislation through the initiative process. Under our state constitution, the people's legislative power is equal to the Legislature's. The Legislature exercises its power by passing laws during legislative sessions. The people exercise their power by voting during elections on initiatives that have qualified for the ballot. If the people approve a proposed initiative, it becomes a statute in the Utah Code.

¶3    The second provision is the Alter or Reform Clause of article I, section 2, which establishes that the people of Utah have the right to "alter or reform their government as the public welfare may require."

¶4    The novel question before us asks: what happens when Utahns use their initiative power to exercise their "right to alter or reform their government" by passing an initiative that contains government reforms, and the Legislature repeals it and replaces it with another law that eliminates the reforms the people voted for?

¶5    Plaintiffs answer that this is an unconstitutional violation of the people's right to reform their government[1] through a citizen initiative. And they allege that this happened when the Legislature repealed and replaced an initiative called "Better Boundaries" or "Proposition 4," which the people passed during the 2018 election. Proposition 4 sought to reform the process of drawing Utah's electoral districts (redistricting) by prohibiting a practice called "partisan gerrymandering." In general, partisan gerrymandering refers to efforts by incumbent politicians to draw electoral

---

[1]    Throughout this opinion, we refer to the right established in the Alter or Reform Clause variously as the people's "right to alter or reform their government," "right to reform their government," and their "reform right." When we use shorthand, we do so only for ease of reference. We intend to refer to the right established in the Alter or Reform Clause of article I, section 2 in its entirety.

boundaries that benefit themselves and their political party by diluting the votes of citizens they predict will vote for candidates of other parties.[2] Utah voters approved Proposition 4 at the ballot box. But the Legislature repealed the initiative before the next redistricting cycle.[3] The Legislature then replaced Proposition 4

---

[2] *See Rucho v. Common Cause*, 588 U.S. 684, 693 (2019) (describing the methods of partisan gerrymandering as dividing disfavored voters among districts "so that they fall short of a majority in each" (cracking), or highly concentrating disfavored voters in a district "so they win that district by a large margin, wasting many votes that would improve their chances in others" (packing) (cleaned up)); *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 791 (2015) (describing partisan gerrymandering as "the drawing of legislative district lines to subordinate adherents of one political party and entrench a rival party in power").

[3] The parties disagree as to whether the Legislature *repealed* Proposition 4 or merely *amended* it. But as we will discuss further, the question of constitutional significance goes beyond whether the Legislature amends or repeals a government-reform initiative as a technical matter, to whether the Legislature's changes to the initiative impair the reform it codifies. *See infra* ¶¶ 73, 162. Accordingly, when we use the terms "amend" or "repeal" in this opinion, we do not necessarily describe the extent to which the initiative was substantively changed. Rather, we often use these terms merely to describe actions taken during the legislative process. To determine the constitutional significance of these legislative actions, the question is whether they impaired the reforms contained in the initiative, and therefore infringed upon the people's right to reform their government.

We also clarify our use of the terms "initiative," "Proposition 4," and "S.B. 200." During the 2020 General Session, the Legislature passed Senate Bill 200, which did two things. First, it repealed the initiative enacted by the voters, which was formally titled the "Utah Independent Redistricting Commission and Standards Act," and was codified at Title 20A, Chapter 19 of the Utah Code. Instead of referring to the initiative by its formal name or code number, we call it the "initiative" or "Proposition 4." Second, S.B. 200 replaced the initiative with a new law found at Title 20A, Chapter 20. We refer to both the bill and the new law as

(continued . . .)

with another law, Senate Bill 200, which did not prohibit partisan gerrymandering. Plaintiffs assert that when it came time for redistricting—with Proposition 4's requirements out of the way—Defendants drew new electoral districts that were the result of "extreme" partisan gerrymandering.

¶6     Defendants answer the question differently. They argue that the Legislature's repeal and replacement of Proposition 4 did not offend the constitution at all. They contend that because the Legislature is authorized to amend or repeal any statute, and a citizen initiative is a statute, the Legislature is permitted to repeal initiatives without any constitutional limitation.

¶7     We answer the question before us as follows:

¶8     The people's constitutional right to alter or reform their government is protected from government infringement. We could not hold otherwise, as the Declaration of Rights of the Utah Constitution states explicitly that:

> All political power is inherent in the people; and all free governments are founded on their authority for their equal protection and benefit, *and they have the right to alter or reform their government as the public welfare may require*.

UTAH CONST. art. I, § 2 (emphasis added).

¶9     Like all constitutional provisions, the Alter or Reform Clause must be read in harmony with the rest of the constitution and exercised within the bounds of the constitution itself. Thus, it does not establish a right to reform the government in disregard of the constitution, nor in a manner that violates other provisions of the constitution.

¶10  One way for Utahns to exercise their reform right within the bounds of the constitution is through a citizen initiative, as established in the Initiative Provision of article VI of the Utah Constitution. The initiative power gives Utahns a mechanism to pass legislation that contains their desired government-reform measures. Thus, the Initiative Provision empowers Utahns to

---

S.B. 200. We also refer to the enactment of S.B. 200 and its repeal and replacement of Proposition 4, collectively, as "legislative action."

directly exercise their right to reform their government by enacting statutory government reforms.[4]

¶11 Therefore, we hold that when Utahns exercise their right to reform the government through a citizen initiative, their exercise of these rights is protected from government infringement. This means that government-reform initiatives are constitutionally protected from unfettered legislative amendment, repeal, or replacement. Although the Legislature has authority to amend or repeal statutes, it is well settled that legislative action cannot unduly infringe or restrain the exercise of constitutional rights. Consequently, when Utahns exercise their right to reform the government through an initiative, this limits the Legislature's authority to amend or repeal the initiative. This does not mean that the Legislature cannot amend a government-reform initiative at all. Rather, legislative changes that facilitate or support the reform, or at least do not impair the reform enacted by the people, would not implicate the people's rights under the Alter or Reform Clause. Legislative changes that do impair the reforms enacted by the people could also survive a constitutional challenge, if the Legislature shows that they were narrowly tailored to advance a compelling government interest.

¶12 In this case, Plaintiffs claim in Count V of their Complaint that Utahns used their initiative power as a means of exercising their right to reform the government when they passed Proposition 4. And they claim that the Legislature violated those rights when it enacted S.B. 200, which repealed Proposition 4 and replaced it with a new law that nullified Proposition 4's key provisions. The Legislature's general legislative power to amend, repeal, and enact statutes does not defeat this claim as a matter of law.

---

[4] We emphasize that reforms enacted through the initiative process must be statutory—in other words, capable of being accomplished through legislation. This is because an initiative, like all statutes, cannot amend the Utah Constitution. So if the people wanted to reform the government in a way that would require a change to the constitution, they would have to follow the constitutional amendment process, not the initiative process.

¶13 Accordingly, we reverse the district court's dismissal of Count V. And we remand this case, with Count V intact, to the district court for further proceedings consistent with this opinion.[5]

## BACKGROUND

¶14 We now provide the factual background of this appeal, beginning with an explanation of the redistricting process, then moving to the facts that gave rise to Plaintiffs' lawsuit, and finally discussing the litigation that has taken place so far in the district court. We emphasize that our recitation of the facts underlying Plaintiffs' lawsuit is based on the allegations in their Complaint. Because this appeal involves Defendants' motion to dismiss Plaintiffs' claims, we must assume all the factual allegations in the Complaint are true and determine whether the claims fail as a matter of law.[6]

*The Ten-Year Cycle of the National Census and Electoral Redistricting*

¶15 Every ten years, the federal government conducts a census to count our nation's population. U.S. CONST. art. I, § 2, cl. 3. One purpose of collecting this census data, which shows population growth and decline across the country, is to adjust the apportionment of the 435 seats in the U.S. House of Representatives

---

[5] For reasons that we discuss below, we retain jurisdiction over Defendants' appeal of the district court's denial of their motion to dismiss Counts I through IV. *See infra* Section II.B. Accordingly, those claims are stayed for the time being. This is because the resolution of Count V may render Counts I through IV moot. If the adjudication of Count V does not moot or otherwise resolve Counts I through IV, we will resolve Defendants' appeal of those claims.

[6] Defendants moved to dismiss on two grounds: "lack of jurisdiction over the subject matter" and "failure to state a claim upon which relief can be granted." UTAH R. CIV. P. 12(b)(1), (6). Defendants' arguments on the first ground amounted to a "facial challenge" — in the sense that they did not "attack[] the factual allegations underlying [Plaintiffs'] assertion of jurisdiction." *See Salt Lake County v. State*, 2020 UT 27, ¶ 26, 466 P.3d 158 (cleaned up). So with respect to both grounds for dismissal, "we must accept . . . [Plaintiffs'] factual allegations as true." *Hudgens v. Prosper, Inc.*, 2010 UT 68, ¶ 2, 243 P.3d 1275; *see also Salt Lake County*, 2020 UT 27, ¶ 26.

among the fifty states. *See id.* After the census data is released, every state, including Utah, re-draws its electoral districts to account for the addition or loss of congressional seats and population changes within the state. This process is called redistricting.

¶16   After Utah receives the results of the decennial census, the Utah Constitution requires the Legislature to "divide the state into congressional, legislative, and other districts accordingly," no later than the next general legislative session. UTAH CONST. art. IX, § 1. Each district of the same type must contain approximately the same number of people.[7]

¶17 The 2010 census showed significant growth in Utah's population, and as a result Utah gained an additional congressional seat, bringing the total number to four.[8]

¶18   The most recent census was conducted in 2020. It shows that from 2010 to 2020, Utah was the fastest growing state in the nation by percentage.[9] But this population growth was not equally distributed across the state. The bulk of Utah's new residents settled in urban areas in Salt Lake County and Utah County. And 80% of the total population lived in urban centers along the Wasatch Front. During the same period, other parts of the state lost population.

¶19   Despite Utah's rapid growth over the last decade, we did not gain any additional seats in Congress after the 2020 census. So Utah still has four seats in the U.S. House of Representatives, and

---

[7]   The U.S. Constitution requires states to "design both congressional and state-legislative [voting] districts with equal populations." *Evenwel v. Abbott*, 578 U.S. 54, 59 (2016) (citing *Wesberry v. Sanders*, 376 U.S. 1 (1964), and *Reynolds v. Sims*, 377 U.S. 533 (1964)).

[8]   *See Guide to 2010 State & Local Census Geography: Utah*, U.S. CENSUS BUREAU (Oct. 8, 2021), https://www.census.gov /geographies/reference-files/2010/geo/state-local-geo-guides-2010/utah.html#:~:text=For%20the%20111th%20Congress,based %20on%20the%202010%20Census.

[9]   *See Utah Was Fastest-Growing State From 2010 to 2020*, U.S. CENSUS BUREAU (Aug. 25, 2021), https://www.census.gov /library/stories/state-by-state/utah-population-change-between-census-decade.html.

each congressional district must contain an equal number of people.

*Partisan Gerrymandering*

¶20 Plaintiffs allege that partisan gerrymandering "has been a consistent problem and contentious issue in Utah's history" of redistricting. As described above, partisan gerrymandering refers to efforts by incumbent politicians to draw district boundaries that benefit themselves and their political party, by diluting the votes of citizens they disfavor because they predict those citizens will vote for candidates of other parties. *See Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 791 (2015) (describing partisan gerrymandering as "the drawing of legislative district lines to subordinate adherents of one political party and entrench a rival party in power"). Partisan gerrymandering can be achieved by "cracking" or "packing" districts. A "cracked" district is one in which politicians from one political party divide their disfavored voters—disfavored because they are likely to vote for other parties' candidates—"among multiple districts, so that they fall short of a majority in each;" a "packed" district is one in which politicians highly concentrate disfavored voters, "so they win that district by a large margin, 'wasting' many votes that would improve their chances in others." *Rucho v. Common Cause*, 588 U.S. 684, 693 (2019) (discussing *Gill v. Whitford*, 585 U.S. 48 (2018)).

¶21 Plaintiffs contend that the majority party in the Legislature has a history of cracking Salt Lake City and Salt Lake County, where a concentration of voters they disfavor resides. They allege that Proposition 4 was a response to the Utah Legislature's "history of drawing electoral maps that dilute the voting strength of some voters based on their party affiliation." Plaintiffs state that after the 2000 census, "the Wall Street Journal Editorial Board . . . described Utah's congressional map for that decade as a blatant partisan gerrymander that was a 'scam' to unseat Democratic Representative Jim Matheson by cracking his Salt Lake City-based seat."[10]

¶22 And Plaintiffs claim that ten years later, after the 2010 census, "the Legislature conducted its mapmaking behind closed

---

[10] Citing Editorial, *The Gerrymander Scandal*, WALL ST. J., (Nov. 7, 2001), https://www.wsj.com/articles/SB10050978282586 86800.

doors to devise a map that would increase Republican advantage in the State's now-four districts." While "public polling at the time[] [showed that] both Democrats and Republicans supported drawing a district that would keep urban voters together in a single district covering Salt Lake City," "the Legislature divided Salt Lake County into three narrow urban slices that were then combined with large tracts of the rest of Utah." The reason the Legislature gave for drawing these boundaries was that it "sought to achieve a mix of urban and rural areas in all four districts." But Plaintiffs allege that "the 2011 congressional map again targeted Democratic Representative Matheson's Salt Lake City-centered district," "split[ting] Matheson's former district three ways and forc[ing] him to shift to the newly created 4th Congressional District."

¶23  Plaintiffs allege that today, technological advancements make gerrymandering efforts even more precise than in the past.

*The Citizen Initiative to Reform Redistricting and Prohibit Partisan Gerrymandering: "Better Boundaries" or "Proposition 4"*

¶24  In the 2018 election—a couple of years before the 2020 census would trigger a new round of redistricting—a citizen initiative aimed at ending partisan gerrymandering qualified to be placed on the ballot for consideration by Utah voters. The proposed initiative garnered nearly 200,000 signatures from Utahns across the state, clearing the required signature threshold. *See* UTAH CODE § 20A-7-201(1)(a).

¶25  The official name of the initiative was "The Utah Independent Redistricting Commission and Standards Act." But it was colloquially referred to as "Better Boundaries" or "Proposition 4." In proposing this initiative, the sponsors invoked the people's rights under article I, section 2 of the Utah Constitution, "inform[ing] voters that Proposition 4 was a government reform measure invoking the people's constitutional lawmaking authority, and it was designed to 'return[] power to the voters and put[] people first in our political system.'" (Quoting *Proposition 4*, *in* UTAH VOTER INFORMATION PAMPHLET 74, 76 (Sept. 3, 2018) [*hereinafter Voter Pamphlet*], https://vote.utah.gov/wp-content/uploads/sites/42/2023/09/2018-VIP.pdf.)

¶26  In the Voter Pamphlet, initiative proponents argued that gerrymandering had "gotten out of control," and had made

politicians less accountable to the people. *Voter Pamphlet* at 76. The Voter Pamphlet further stated:

> Voters should choose their representatives, not vice versa. Yet under current law, Utah politicians can choose their voters. Legislators draw their own legislative districts with minimal transparency, oversight, or checks on inherent conflicts of interest. As a result, politicians wield unbridled power to design districts to ensure their own re-election.

*Id.* Proponents argued that the current system "empower[s] politicians, not voters." *Id.*

¶27 Proposition 4's proponents called upon Utah voters to fix the problem of partisan gerrymandering themselves, arguing: "To be fair, we can't expect legislators to fix the system. It benefits them. We the People must fix it." *Id.*

¶28 Utah voters agreed, passing Proposition 4 in November 2018 and thereby enacting the Utah Independent Redistricting Commission and Standards Act. *See* UTAH CODE §§ 20A-19-101 to -301 (2018). The new law sought to eliminate partisan gerrymandering by explicitly prohibiting the practice of "divid[ing] districts in a manner that purposefully or unduly favors or disfavors any incumbent elected official, candidate or prospective candidate for elective office, or any political party." *See id.* § 20A-19-103(3) (2018).

¶29 Proposition 4 required that district boundaries be drawn according to neutral redistricting standards, including:

- "minimizing the division of municipalities and counties across multiple districts";

- "creating districts that are geographically compact," "contiguous," and "allow for the ease of transportation throughout the district";

- "preserving traditional neighborhoods and local communities of interest";

- following "natural and geographic features, boundaries, and barriers"; and

- "maximizing boundary agreement among different types of districts."

*See id.* § 20A-19-103(2) (2018).

¶30 And Proposition 4 created the Utah Independent Redistricting Commission (Independent Commission or Commission), *see id.* § 20A-19-201(1) (2018), which would "draw district boundaries through an open and independent process and then submit recommended redistricting plans to the Legislature." *Statement of Intent & Subject Matter*, UTAH INDEPENDENT REDISTRICTING COMMISSION & STANDARDS ACT 1 (2018);[11] *see also* UTAH CODE § 20A-19-204(1)(a) (2018). Proposition 4 required the Commission to hold numerous open meetings throughout the state and increase opportunities for public participation and comment. *See* UTAH CODE § 20A-19-202(5)(b), (7), (9) (2018).

¶31 The initiative provided that once the Independent Commission selected redistricting plans that complied with Proposition 4's requirements, it was to submit them to the Legislature for consideration. *Id.* § 20A-19-204(1)(a) (2018).

¶32 Proposition 4 then required the Legislature to vote on the Independent Commission's recommended redistricting plans and either enact them "without change or amendment," or reject them and propose its own maps. *Id.* § 20A-19-204(2)(a) (2018). If the Legislature rejected the Commission's maps and drew its own, Proposition 4 required the Legislature to follow Proposition 4's requirements—specifically, it prohibited the Legislature from engaging in partisan gerrymandering and required the Legislature to follow the initiative's neutral redistricting standards. *Id.* § 20A-19-103(2)–(6) (2018). Further, the Legislature was required to explain to the public its "reasons for rejecting" the Independent Commission's plans and why the Legislature's plans "better satisfie[d]" the neutral "redistricting standards and requirements" of Proposition 4. *Id.* § 20A-19-204(5)(a) (2018).

¶33 Finally, Proposition 4 contained an enforcement mechanism. It gave Utah residents a private right of action to challenge any redistricting plans enacted by the Legislature that

---

[11]  The full text of Proposition 4, including the Statement of Intent and Subject Matter, can be found online. *See Utah Independent Redistricting Commission and Standards Act Combined Files*, UTAH.GOV 8, https://vote.utah.gov/wp-content/uploads/sites /42/2023/09/Utah-Independent-Redistricting-Commission-And-Standards-Act-Combined-Files.pdf (last visited July 5, 2024).

did not conform to Proposition 4's requirements. *Id.* § 20A-19-301 (2018).

*The Legislature's Enactment of Senate Bill 200, Which Repealed and Replaced Proposition 4*

¶34 But before the 2020 redistricting cycle began, the Legislature enacted S.B. 200, which repealed Proposition 4 and replaced it with a new law.[12] Senate Bill 200 incorporates some of the features of Proposition 4, but Plaintiffs allege that it "rescind[s] critical Proposition 4 reforms and enact[s] watered-down versions of others." Specifically, Plaintiffs allege that under S.B. 200:

- the ban on partisan gerrymandering and the mandatory neutral redistricting criteria no longer apply to maps the Legislature creates;

- the Independent Commission still exists, but its role is weakened because the Legislature "may, but is not required to, vote on or adopt a map submitted . . . by the Commission," *see* UTAH CODE § 20A-20-303(5);

- if the Legislature does choose to vote on the Commission's recommended maps, it can "reject [them] for any reason or no reason at all and with no explanation";

- "transparency and public accountability safeguards" are eliminated; and

- the enforcement mechanism is eliminated.

¶35 Plaintiffs also allege that "[e]ven after [S.B. 200] repealed Proposition 4, many legislators represented that the Legislature would still honor the people's lawmaking decision to reform redistricting." For example, "the chief sponsor of [S.B. 200] said he was 'committed to respecting the voice of the people and maintaining an independent commission.'" And the Senate Majority Leader at the time "vowed that [S.B. 200] would still 'meet the will of the voters' and that the Legislature would 'reinstate in [S.B. 200] almost everything they've asked for.'" Further, some representatives in the Utah House indicated that while portions of Proposition 4 would be "tweaked," the Legislature would leave the anti-gerrymandering provisions largely intact and would "make

_____

[12] Redistricting Amendments, S.B. 200, 63d Leg., 2020 Gen. Sess. (Utah 2020), https://le.utah.gov/~2020/bills/static /SB0200.html; UTAH CODE §§ 20A-20-101 to -303.

sure that we have an open and fair process when it comes time for redistricting."

*The Redistricting Process Begins*

¶36 Plaintiffs allege that despite these assurances, the Legislature's Congressional Map for the 2022 election was the product of extreme partisan gerrymandering, with little public participation or transparency. After Utah received the results of the 2020 census, the Legislature and the Independent Commission, as modified by S.B. 200, began work on their respective redistricting plans.

¶37 In April 2021, the Legislature formed a twenty-member Legislative Redistricting Committee (LRC), made up of fifteen Republicans and five Democrats. Plaintiffs allege that the LRC's process "was designed to achieve—and did in fact achieve—an extreme partisan gerrymander." The LRC "conducted its map-drawing and decision-making processes almost entirely behind closed doors." The LRC would not commit to avoiding unduly favoring or disfavoring any political party. And the only redistricting standards it agreed to follow related to "population parity among districts, contiguity, and reasonable compactness."

¶38 Meanwhile, the Independent Commission performed its duties under S.B. 200, even though the new law had weakened its role in the process. Senate Bill 200 required the Commission to "define and adopt redistricting standards" to govern its map drawing process that mirrored the seven traditional, neutral redistricting criteria from Proposition 4. UTAH CODE § 20A-20-302(5). But the new law did not forbid the Commission from using partisan political data in its map drawing, instead providing that the Commission "may adopt a standard" prohibiting the use of such data. *Id.* § 20A-20-302(6).

¶39 According to the Complaint, the Independent Commission adopted all the neutral redistricting standards of Proposition 4. And to ensure it avoided partisan redistricting, the Commission drew maps "blind to partisan data of any sort." The Commission's process was open to the public and involved significant public input. The Commission met thirty-two times and "spent hundreds of hours traveling the State to hear Utahns' opinions on the redistricting process." It held fifteen public meetings throughout the state, and it supplemented the hearings with "additional outreach over social and other media." It

livestreamed all of its public meetings and hearings, and then posted recordings online. And it solicited and received significant public input.

¶40   Ultimately, the Commission unanimously approved three congressional maps and presented them to the LRC on November 1, 2021. *See* Appendix. The proposed maps included a detailed explanation of the non-partisan process the Commission used in preparing the maps.

¶41 But Plaintiffs allege that almost immediately after the Commission submitted its proposed maps to the LRC, the LRC adopted its own Congressional Map and ignored the Commission's proposals. They allege that "[t]he timing and content of the Legislature's final redistricting plan reveal[] that the Legislature decided to adopt its own partisan gerrymandered maps and prescreened them with Republican party leaders long before the Commission even reached the deadline for completing its work." The LRC publicly released its Congressional Map around 10:00 PM on Friday, November 5, 2021 — giving the public only two weekend days to review the map before a scheduled public hearing the following Monday.



This shows the Legislative Redistricting Committee's Congressional Map.



The highlighted area shows Salt Lake County, divided in four pieces.

¶42   The LRC's Congressional Map divided Salt Lake County—which Plaintiffs describe as having Utah's largest concentration of people who vote for candidates from minority parties—into four pieces, with each slice placed in a different congressional district. District 1 "emanates from the northeast quadrant of Salt Lake County and extends to cover the entire northern part of the State up to the Utah-Idaho border." "District 2 covers the northwest quadrant of Salt Lake County and extends over 300 miles south and west to reach most of Utah's borders with Nevada and Arizona . . . ." "District 3 encompasses the southeast section of Salt Lake County and then widens to include Utah's entire eastern border[,] as well as part of the northern border in Summit and Daggett Counties and part of the Southern border in San Juan County." And finally, "District 4 takes the southwest quadrant of Salt Lake County and combines it with a central Utah district ending at the bottom of Sanpete County."

¶43   The four districts converge in Millcreek, a growing city in Salt Lake County where a majority of voters traditionally support minority party candidates. So residents of one city, Millcreek, are divided among the First, Second, Third, and Fourth Congressional Districts.



The highlighted area is Millcreek, divided among the four congressional districts.

¶44  In a statement accompanying the Congressional Map, the LRC explained that each district includes urban and rural parts of the state because "[w]e are one Utah[] and believe both urban and rural interests should be represented in Washington, D.C. by the entire federal delegation."[13]

¶45  Plaintiffs allege that, despite the short timeframe before the public meeting, there was an outpouring of public opposition to the Congressional Map. "So many Utahns . . . submit[ted] their online statements opposing the LRC's proposed electoral boundaries that they crashed the LRC's public comment website." "A group of eighty-four prominent Utah business and community leaders" held a press conference at the Capitol "condemn[ing] the LRC's map as a partisan gerrymander." Utahns "gathered in large numbers on the steps of the state Capitol to protest the LRC's map." And while the Legislature received eleven emails supporting the Congressional Map, it received 930 emails criticizing it as a partisan gerrymander and urging it to use one of the Commission's neutral maps.

¶46  At a public hearing three days later, "an overwhelming majority of the hundreds of Utahns who attended . . . expressed their outrage about the LRC overriding the Commission and the

---

[13]  Katie McKellar, *Utah Lawmakers Released Their Proposed Redistricting Maps. Accusations of Gerrymandering Swiftly Followed*, DESERET NEWS (Nov. 6, 2021, 9:50 AM), https://www.deseret.com/2021/11/6/22766845/utah-lawmakers-released-their-proposed-redistricting-maps-accusations-of-gerrymandering-salt-lake (quoting statement of Senator Scott Sandall).

public will." Citizens "urged the LRC to abandon its proposed partisan gerrymander." One speaker said, "please listen to the independent commission's recommendations and stop playing politics."

¶47  At the conclusion of the hearing, the LRC voted along party lines to approve the Congressional Map. Over the next week, the Legislature voted to approve the Map. Governor Spencer Cox then signed it into law. Plaintiffs note that Governor Cox "acknowledged there was 'certainly a partisan bend' in the Legislature's redistricting process."

*Plaintiffs' Lawsuit*

¶48  In response to the Legislature's repeal and replacement of Proposition 4 and the resulting Congressional Map, Plaintiffs filed this case in the district court. Their claims fall into two categories.

¶49 First, they challenge the Legislature's repeal of Proposition 4. They assert that when the voters of Utah enacted Proposition 4, they exercised two rights protected by the Utah Constitution: (1) the people's right to directly initiate legislation under the Initiative Provision of article VI, section 1; and (2) the people's right to alter or reform their government under the Alter or Reform Clause of article I, section 2. Plaintiffs assert that when the Legislature repealed Proposition 4 and replaced it with S.B. 200, the Legislature effectively nullified the redistricting reform enacted by the people, and in doing so, violated both of these constitutional rights. This claim is found in Count V of Plaintiffs' Complaint.

¶50 Second, Plaintiffs claim that the Legislature's Congressional Map is the product of extreme partisan gerrymandering. They allege that the Map violates Utahns' rights under the Utah Constitution to free elections, to vote, to free speech and association, and to the uniform operation of laws. These claims are found in Counts I through IV of Plaintiffs' Complaint.

*Defendants' Motion to Dismiss*

¶51  In the district court, Defendants moved to dismiss all of Plaintiffs' claims. With respect to Count V, which challenges the Legislature's repeal and replacement of Proposition 4, Defendants argued that the Legislature did not violate the people's right to initiate legislation or their right to alter or reform their government because the Legislature has unlimited authority to amend or repeal any statute, including those enacted by initiative. Therefore, because initiatives, including Proposition 4, are statutes, the

Legislature argued it had unfettered power to amend or repeal Proposition 4 without running afoul of the constitution. The district court agreed and dismissed Count V of the Complaint.

¶52 With respect to Counts I through IV, which allege that the Congressional Map itself violates the Utah Constitution, Defendants argued that the courts could not intervene because these claims involve "nonjusticiable political questions." Specifically, Defendants contended that article IX, section 1 of the Utah Constitution grants redistricting power solely to the Legislature, so "[a]bsent an express constitutional limitation . . . the Court does not have jurisdiction to opine on the political decision of the political branch regarding where to draw district lines and the resulting effect on the potential success of a given political party's efforts to gain political power." Defendants further argued that there are no judicially discoverable or manageable standards for assessing Plaintiffs' partisan gerrymandering claims. In making this argument, Defendants relied upon federal caselaw premised on the view that some amount of partisan gerrymandering is permissible. *See Rucho*, 588 U.S. at 701 ("[A] jurisdiction may engage in constitutional political gerrymandering." (cleaned up)). So, Defendants reasoned, the "central problem" for the courts is "determining when political gerrymandering has gone too far." (Quoting *id.* at 685.)

¶53 In the alternative, Defendants argued that the state constitutional rights invoked by Plaintiffs—the right to free elections, to vote, to free speech and association, and to the uniform operation of laws—do not prohibit partisan gerrymandering.

¶54 The district court rejected these arguments and denied Defendants' motion to dismiss Plaintiffs' challenges to the constitutionality of the Congressional Map. The district court first concluded that these claims were justiciable. It reasoned that the constitutional questions presented in the litigation were not political questions, but legal ones with existing "judicially discoverable and manageable standards" to review them. Accordingly, the court determined it had jurisdiction to answer those legal questions.

¶55 And ultimately, the district court disagreed with Defendants' contention that each of Plaintiffs' challenges failed to state a claim for which the court could grant relief. Before addressing each claim, the district court reiterated that at the motion to dismiss stage, it could grant the motion only if "the

allegations of the complaint clearly demonstrate[d] that . . . [Plaintiffs] [did] not have a claim." (Quoting *Pioneer Home Owners Ass'n v. TaxHawk Inc.*, 2019 UT App 213, ¶ 19, 457 P.3d 393 (cleaned up).)

¶56  Addressing each constitutional claim, the district court concluded that Plaintiffs had sufficiently alleged that the Congressional Map:

- violates the Free Elections Clause because it was "enacted for partisan advantage" and "had the effect of substantially diminishing or diluting the votes" of citizens who were unlikely to vote for the majority party;

- violates the Uniform Operation of Laws Clause because it classifies voters based on their political views and geographic location and treats similarly situated voters disparately without adequate justification;

- violates some Utahns' rights to free speech and free association because it discriminates and retaliates against citizens based on their political views and past voting records and burdens those citizens' ability to express their political views and effectively associate with others of the same viewpoint; and

- violates some Utahns' right to vote because, although they are able to engage in the act of voting, "[t]heir disfavored vote is meaningless, diluted, impaired[,] and infringed due to the intentional partisan gerrymandering" with no legitimate justification.

Accordingly, the district court denied Defendants' motion to dismiss Plaintiffs' constitutional challenges to the Congressional Map.

*The Petitions for Interlocutory Appeal*

¶57  Defendants petitioned for permission to appeal the district court's denial of their motion to dismiss Plaintiffs' constitutional challenges to the Congressional Map (Counts I through IV of the Complaint). And Plaintiffs petitioned for permission to appeal the court's dismissal of their Proposition 4 claim (Count V). We granted both petitions.

¶58  We have jurisdiction over interlocutory appeals under Utah Code subsection 78A-3-102(3)(j).

**STANDARD OF REVIEW**

¶59  We review the grant or denial of a rule 12(b)(6) motion to dismiss "for correctness, giving no deference to the district court's determination." *Christiansen v. Harrison W. Constr. Corp.*, 2021 UT 65, ¶ 10, 500 P.3d 825. A district court should grant a 12(b)(6) motion to dismiss "only if assuming the truth of the allegations in the complaint and drawing all reasonable inferences therefrom in the light most favorable to the plaintiff, it is clear that the plaintiff is not entitled to relief." *Castro v. Lemus*, 2019 UT 71, ¶ 11, 456 P.3d 750 (cleaned up). Put another way, "[t]he district court's ruling should be affirmed only if it clearly appears that the plaintiff can prove no set of facts in support of [the plaintiff's] claim." *Am. W. Bank Members, L.C. v. State*, 2014 UT 49, ¶ 7, 342 P.3d 224 (cleaned up). And "[u]nder a rule 12(b)(6) dismissal, our inquiry is concerned solely with the sufficiency of the pleadings, and not the underlying merits of the case." *Oakwood Vill. LLC v. Albertsons, Inc.*, 2004 UT 101, ¶ 8, 104 P.3d 1226 (cleaned up).[14]

**ANALYSIS**

¶60  This case presents two sets of issues for our review: (1) Plaintiffs' appeal of the district court's dismissal of Count V, which contains Plaintiffs' claim that the Legislature nullified the redistricting reform enacted by the people in Proposition 4 and, in doing so, violated the people's constitutional right to reform the government through a citizen initiative; and (2) Defendants' appeal of the district court's denial of their motion to dismiss Counts I through IV of the Complaint, which contain Plaintiffs' claims that the Congressional Map is an extreme partisan gerrymander that violates numerous provisions of the Utah Constitution.

¶61  The issues raised by the parties present questions of first impression involving the interpretation of numerous provisions of the Utah Constitution. We first address the district court's dismissal of Count V because it is the broadest claim, encompassing both matters at issue in this case: Plaintiffs' challenge to the redistricting process that led to the Congressional Map and their

---

[14] We likewise review the grant or denial of a facial rule 12(b)(1) challenge for correctness. *See Granite Sch. Dist. v. Young*, 2023 UT 21, ¶ 15, 537 P.3d 225. But as explained, we do not reach Defendants' arguments that the district court should have granted their motion under rule 12(b)(1). *See infra* Section II.B.

challenge to the Congressional Map itself. Specifically, Count V involves the parties' dispute over whether the citizen reform initiative, Proposition 4, or the Legislature's replacement of the initiative, S.B. 200, should govern the redistricting process. And consequently, it also encompasses the constitutionality of the Congressional Map that resulted from S.B. 200 and was not subject to Proposition 4's requirements. In contrast, Counts I through IV each involve a discrete constitutional challenge to the Congressional Map alone.

¶62 Turning to Count V, we conclude that the district court erred in dismissing this claim. Plaintiffs allege that Defendants violated Utahns' right to alter or reform their government through an initiative by enacting S.B. 200, which repealed and replaced Proposition 4. Defendants argued in the district court that no constitutional violation occurred, because the Legislature is authorized to amend or repeal any statute, including a citizen initiative. On that basis, the district court dismissed Count V. But a close look at the original public meaning of the Alter or Reform Clause and the Initiative Provision reveals that Utahns' exercise of these constitutional rights is protected from undue government infringement. Thus, these constitutional provisions limit the Legislature's authority to amend or repeal an initiative that reforms the government. For this reason, Count V cannot be dismissed as a matter of law on the basis of the Legislature's authority to amend or repeal laws generally.

¶63 Accordingly, we reverse the dismissal of Count V.[15]

_____

[15] We appreciate the perspective and insight that we received from the numerous amicus briefs submitted in this case. They were thoughtful and well researched, and we appreciate the effort that went into them. While we cannot respond to the points raised in each brief individually, we take a moment to respond to two amicus briefs that focused directly on the holding we reach today. We asked the parties for supplemental briefing on the legal standard applicable to Plaintiffs' claim that the nullification of Proposition 4 violated the people's right to reform their government through a citizen initiative. In addition to the parties' supplemental briefs, we received amicus briefs from Governor Spencer Cox and the Utah Association of Counties (Counties) on

(continued . . .)

this point. We thank the Governor and the Counties for sharing their views and concerns with us.

We are cognizant that when we decide a case, our holding will apply in future cases raising the same legal issue. For this reason, we do our best to avoid unintended consequences from rulings that sweep too broadly. So we appreciate the Governor and the Counties flagging potential unintended consequences that, from their perspective, might flow from a holding that the Alter or Reform Clause establishes a constitutional right of the people to reform their government. As we explain in this opinion, we conclude that the original public understanding of the Alter or Reform Clause was that it enshrined a constitutional right of the people of Utah to reform their government. We have endeavored to describe the scope of this right, consistent with its original public meaning, in a manner that is clear, accurate, and precise. Throughout the opinion, we have addressed many of the concerns raised by the Governor and the Counties. And we list the relevant sections here for ease of reference.

With respect to the Governor's amicus brief, please see *infra* ¶¶ 73, 162 (explaining that amendments to government-reform initiatives that do not impair the reform would not implicate the Alter or Reform Clause), *infra* ¶¶ 122–26, 134–36, 161 (explaining that the people's right to reform the government must be exercised within the bounds of the constitution itself, so the people must exercise the right through a constitutionally-recognized mechanism—like the constitutional amendment process or the initiative power—and when they use their initiative power, the initiative can accomplish only those reforms that can be achieved by statute and cannot violate other constitutional provisions), *infra* ¶¶ 164–71 (explaining why the argument that government-reform initiatives are subject to unlimited legislative repeal conflicts with the original public meaning of article I, section 2 and the Initiative Provision), and *infra* ¶¶ 195–98 (addressing the concern that Proposition 4 violated article IX of the constitution). We also note the Governor's concern that limiting the Legislature's ability to repeal government-reform initiatives would tip the balance of power toward direct democracy and away from our republican form of government. When the amendment to give Utahns direct legislative power was placed before voters in 1900, this was a key point of debate. *See infra* ¶¶ 148–53. Despite this concern, however,

(continued . . .)

## I. COUNT V

¶64 We now analyze Plaintiffs' argument that the district court erred in dismissing Count V of their Complaint. Because Plaintiffs' claim involves legal issues of first impression, we first elucidate the law that applies to Count V. Two rights are at issue in this claim: the right to alter or reform the government, found in the Alter or Reform Clause of article I, section 2 of the Utah Constitution, and the right to initiate legislation, found in the Initiative Provision in article VI, subsections 1(1)(b) and 1(2).

¶65 Article I, section 2 states: "All political power is inherent in the people; and all free governments are founded on their authority for their equal protection and benefit, and they have the right to alter or reform their government as the public welfare may require."

¶66 Article VI, subsection 1(1) provides that "[t]he Legislative power of the State shall be vested in: (a) a Senate and House of Representatives which shall be designated the Legislature of the State of Utah; and (b) the people of the State of Utah as provided in

---

Utahns in 1900 decided to retain for themselves the power to legislate directly. And we must interpret this right consistent with Utahns' understanding of it in 1900. As we have emphasized, "when we interpret our constitution, we are not simply shopping for interpretations that we might like" or for one that, in our view, "best serve[s] the people of Utah." *Randolph v. State*, 2022 UT 34, ¶ 69, 515 P.3d 444. Rather, we "try[] to understand what the language meant" to the public at the time "and we go from there." *Id.*

With respect to the Counties' amicus brief, please see *infra* ¶ 72 (explaining that our holding today applies only to initiatives that advance government reforms within the meaning of the Alter or Reform Clause, not those that have no reform element), *infra* ¶¶ 73, 162 (explaining that amendments to government-reform initiatives that do not impair the reform would not implicate the Alter or Reform Clause), and *infra* ¶¶ 122–26, 134–36, 161 (explaining that the right to reform the government must be exercised within the bounds of the constitution). We also observe that local initiatives can only establish laws applicable to the local jurisdiction. They cannot change state laws that apply to all local governments. *See Carter v. Lehi City*, 2012 UT 2, ¶¶ 28, 31, 269 P.3d 141.

Subsection (2)." Subsection (2) then sets out how the people may "initiate any desired legislation" or referendum.

¶67 We have long recognized the connection between article I, section 2 and the Initiative Provision. Article I, section 2 makes plain that the people are the font of political power in a constitutional republic. *See Carter v. Lehi City*, 2012 UT 2, ¶ 21, 269 P.3d 141. At the time of Utah's founding, Utahns exercised their inherent political power to create the Utah Constitution and, in it, to "allocate governmental power" among the three branches of state government. *Id.* ¶¶ 21–22. Through this same sovereign authority, the people amended the constitution to add the Initiative Provision, in which they took back an equal measure of legislative power, which they could exercise directly. *See id.* ¶ 22; *see also Sevier Power Co. v. Bd. of Sevier Cnty. Comm'rs*, 2008 UT 72, ¶ 7, 196 P.3d 583; *Utah Power & Light Co. v. Provo City*, 74 P.2d 1191, 1204–05 (Utah 1937) (Larson, J., concurring). Thus, it was through their own sovereign authority that Utahns retained for themselves the power of direct legislation.

¶68 But the link between these two rights does not end there. In article I, section 2, the people retained for themselves "the right to alter or reform their government as the public welfare may require." As we will explain further, *see infra* ¶¶ 122–26, 134–36, 161, the people's right to alter or reform the government must be exercised within the bounds of the Utah Constitution.[16] And when

---

[16] In his amicus brief, Governor Cox expressed a concern that deeming the Alter or Reform Clause to establish an enforceable constitutional right could sanction government reform through "civil war, terrorism, political assassinations, disrupting normal government operations and proceedings, or the ability to essentially amend the constitution by initiative." But as we will explain, we do not read the Alter or Reform Clause to sanction such conduct. When properly construed according to its original public meaning, this Clause permits the people to reform the government only within the bounds of the constitution, not "in disregard and independently of it." *Koehler v. Hill,* 15 N.W. 609, 615 (Iowa 1881); *See infra* ¶¶ 122–26, 134–36. So, the people can use their constitutional initiative power to exercise their reform right. But in doing so, they can accomplish only *statutory* government reforms. And an initiative cannot violate other provisions of the constitution. *See infra* ¶ 161.

Utahns added the Initiative Provision to the constitution, they gave themselves a constitutional, direct means of exercising their reform right through citizen-enacted legislation.[17]

¶69  Count V alleges that the right to reform the government and the initiative right were exercised in tandem. Specifically, Plaintiffs allege that Utahns used their initiative power as a means of exercising their right to reform the government—in other words, by enacting Proposition 4, the people reformed the redistricting process in a manner that Plaintiffs argue constitutes government reform within the meaning of article I, section 2.

¶70  Accordingly, to analyze Count V, we consider the two rights together. This is not to say that these provisions cannot form the basis of stand-alone claims. *See, e.g.*, *Count My Vote, Inc. v. Cox*, 2019 UT 60, 452 P.3d 1109; *Utah Safe to Learn-Safe to Worship Coal., Inc. v. State*, 2004 UT 32, 94 P.3d 217. But we clarify that in this opinion, our analysis and holdings are specific to situations where the people are alleged to have used their initiative power as a means to exercise their right to reform the government. While we discuss Plaintiffs' stand-alone Initiative Provision claim, we do not resolve it, leaving that issue for another day.

*A. Elements Applicable to Plaintiffs' Claim*

¶71 Because this is the first time we have considered this specific constitutional claim, we set out the elements that should be used to analyze the claim. At a general level, to establish that the government has violated a constitutional right, a plaintiff must establish first that the plaintiff's claim actually implicates the right in question, and second that the government has done something that violates the right. *See, e.g.*, *Am. Bush v. City of South Salt Lake*, 2006 UT 40, ¶ 8, 140 P.3d 1235 (explaining that we first determine

---

[17] In its amicus brief, the Utah Association of Counties expressed a concern that protecting the right to reform the government through a citizen initiative would inevitably apply to all citizen initiatives, including those that have no government reform element. We want to be clear that this opinion applies only to initiatives that seek to alter or reform the government under the Alter or Reform Clause. We expressly leave open the question of whether the constitution limits the Legislature's authority to amend laws created by initiative that do not implicate the Alter or Reform Clause.

whether the freedom of speech clauses were at issue, then whether the government had infringed the right); *Tindley v. Salt Lake City Sch. Dist.*, 2005 UT 30, ¶ 17, 116 P.3d 295 (explaining that under our Open Courts Clause, we first decide whether the rights under that provision are at issue, then turn to whether the government violated those rights).

¶72   Here, Plaintiffs must first show that their claim implicates both the people's right to initiate legislation and their right to reform the government. They can make this showing by establishing that the people exercised their initiative power in passing Proposition 4, and that Proposition 4 contained government reforms or alterations within the meaning of the Alter or Reform Clause. If Plaintiffs cannot show that Proposition 4 involved government reform, then article I, section 2 is not implicated.

¶73  Second, Plaintiffs must establish that the challenged legislative action infringed the exercise of these rights. Here, Plaintiffs allege that the Legislature violated the people's right to reform the government through an initiative by enacting S.B. 200, which repealed Proposition 4 and replaced it with a law that "nullified" Proposition 4's redistricting reforms. To demonstrate that these legislative actions violated the exercise of these rights, Plaintiffs will need to show that S.B. 200 *impaired* the reform contained in Proposition 4. Generally, amendments to a government-reform initiative that support or facilitate the reform—such as grammatical corrections, helpful renumbering, or technical fixes necessary for the effective operation of the initiative—would not satisfy this second element.

¶74  To summarize these elements in more general terms, to prove that legislative action has violated the people's right to reform the government through an initiative, a plaintiff must establish two elements:

> (1) that the people exercised, or attempted to exercise, their initiative power, and the subject matter of the initiative contained government reforms or alterations within the meaning of the Alter or Reform Clause; and
>
> (2) the Legislature infringed the exercise of these rights because it amended, repealed, or replaced the

initiative in a manner that impaired the reform contained in the initiative.

¶75   As we will explain more later, *see infra* Subsection II.A, if a plaintiff can establish these elements, then the legislative action that impairs the reform is unconstitutional unless the defendant shows that it is narrowly tailored to advance a compelling government interest, *see In re Adoption of K.T.B.*, 2020 UT 51, ¶ 40, 472 P.3d 843.

### B. Analysis of Count V and the District Court's Order

¶76   Turning now to the instant case, we use the framework outlined above to address the parties' arguments and the district court's order. To be clear, because we have introduced this formulation for the first time in this opinion, we do not expect the parties or the district court to have used this particular framework when setting out, responding to, or analyzing Plaintiffs' claims, respectively. But the elements we have outlined above are not intended to depart from the usual way in which we analyze a constitutional claim—determining whether the claim implicates the right or rights in question and whether the defendant violated those rights. So the elements we introduce above merely provide a way of ordering the substantive legal analysis that the parties have presented and that the district court conducted in its rulings.

#### 1. Plaintiffs Have Alleged that Utahns Exercised Their Initiative Power by Passing Proposition 4, and that the Subject Matter of Proposition 4 Included Government Reforms Within the Meaning of the Alter or Reform Clause

¶77   With respect to whether the Initiative Provision is implicated by the allegations in Count V, Plaintiffs argue that "[t]here is no dispute in this case that Prop 4 was a validly enacted initiative." Indeed, Defendants have not argued that Count V fails because Proposition 4 was not enacted through a citizen initiative. So this issue is not in dispute in this appeal.

¶78   With respect to whether Count V implicates the Alter or Reform Clause, Plaintiffs argue that Proposition 4 "fit[s] squarely within" the people's article I, section 2 power to reform the government through legislation. They assert that by enacting Proposition 4, "Utahns intended to exercise their article I, section 2 powers to prevent" the "antidemocratic distortions" of partisan gerrymandering "and to ensure that Utah voters can choose their legislators, not the other way around." Plaintiffs argue that Proposition 4 did this in several ways.

¶79 They first note that "Prop 4's proponents explicitly invoked the people's rights to secure their popular sovereignty and to reform their government when they presented the initiative to the voters." Proposition 4's "Statement of Intent and Subject Matter" explained:

> The Utah Constitution provides that "all political power is inherent in the people." Yet, our current redistricting process undermines this fundamental Utah value, because it empowers incumbent politicians to select the people who vote for them and . . . manipulate the redistricting process for their own personal and political gain.

*Statement of Intent & Subject Matter*, UTAH INDEPENDENT REDISTRICTING COMMISSION & STANDARDS ACT 1 (2018).

¶80 Next, in the Voter Pamphlet, initiative proponents argued that the current system of drawing electoral districts was broken and needed to be reformed by the people. The Pamphlet asserted that gerrymandering had "gotten out of control," and had made politicians less accountable to the people in violation of article I, section 2's core principles. *Voter Pamphlet* at 76. Proposition 4's proponents called upon Utah voters to "fix" the problem of gerrymandering themselves, arguing: "To be fair, we can't expect legislators to fix the system. It benefits them. We the People must fix it." *Id.*

¶81 Further, Plaintiffs argue that the "fix" enacted in Proposition 4 "restructured legislative authority" over redistricting by giving the Independent Commission an important role in the process. Before Proposition 4, the Legislature had exclusive control over redistricting. But Proposition 4 required the Legislature to consider the Independent Commission's proposed maps and to vote on the maps. And if the Legislature rejected the maps, it had to issue a written report explaining its decision.

¶82 And finally, Proposition 4 imposed requirements on the redistricting process where the Legislature had previously exercised discretion. Plaintiffs point out that, whether or not the Legislature selected one of the Independent Commission's maps, Proposition 4 imposed requirements on the Legislature's ultimate redistricting plan. Specifically, the plan would be subject to the "prohibition on partisan gerrymandering, the imposition of neutral

redistricting principles, and a statutory cause of action to enforce those enacted provisions in the judiciary."

¶83 On appeal, Defendants do not challenge Plaintiffs' argument that Proposition 4 sought to alter or reform the government as contemplated by article I, section 2. Accordingly, we assume for purposes of this appeal that Count V implicates the Alter or Reform Clause.

¶84 In sum, with respect to the first step of the analysis, Plaintiffs argue that Count V implicates both the Initiative Provision and the Alter or Reform Clause. And Defendants have not argued otherwise on appeal. Thus, for purposes of this appeal, we assume without deciding that Count V implicates the exercise of both rights—specifically, the people's right to reform the government through a citizen initiative. We now move to the second step of the analysis.

2. Plaintiffs Have Alleged a Violation of the People's Right to Reform the Government Through a Citizen Initiative

¶85  The issue before us on appeal centers on the second step of the analysis, whether Plaintiffs have alleged a cognizable claim that Defendants violated the constitutional rights implicated in Count V. We initially note that neither the district court's dismissal nor Defendants' arguments on appeal are premised on the question of *whether* S.B. 200 in fact impaired Proposition 4's reforms. Rather, Defendants argued in the district court, and the district court agreed, that the Legislature's nullification of a government-reform initiative does not present a cognizable constitutional claim as a matter of law because the Legislature is constitutionally permitted to amend and even fully repeal any citizen initiative—including those that reform the government—due to its general power to amend or repeal any statute. And this is the thrust of Defendants' argument on appeal as to why we should affirm the district court's dismissal of Count V. Accordingly, we must ultimately decide whether the Legislature's amendment, repeal, or replacement of a government-reform initiative is constitutionally permitted as a matter of law, or whether the Initiative Provision and the Alter or Reform Clause limit the Legislature's power in this context.

¶86 But before proceeding to this issue of constitutional interpretation, we discuss Plaintiffs' arguments as to how Defendants impaired the government reforms contained in Proposition 4. Plaintiffs argue that the Legislature nullified

Proposition 4's reforms because S.B. 200 completely repealed it and did not "restore[] Prop 4, either in letter or in spirit." Plaintiffs argue that S.B. 200 nullified the redistricting reform contained in Proposition 4 because it

> lacked the initiative's core prohibition on partisan gerrymandering; its mandatory, neutral redistricting standards; and the private cause of action it created to empower the judiciary to enforce these requirements. And the substituted bill rendered the independent commission toothless, replacing it with a process that, in the end, represented an empty gesture that the Legislature spurned when it enacted its own partisan map.

Plaintiffs assert that "[b]y any standard, the Legislature nullified Prop 4 and thereby violated Utahns' constitutional rights."

¶87 As discussed, Defendants contend that S.B. 200 did not violate either the Initiative Provision or the Alter or Reform Clause—but not by arguing that S.B. 200 did not eliminate key provisions of Proposition 4, or that the legislative redistricting process established by S.B. 200 effectively complies with the substance of the initiative. While they do describe S.B. 200 as a compromise measure between the Legislature and the sponsors of Proposition 4, designed to "address constitutional concerns with Proposition 4" while maintaining the spirit of the initiative, they do not dispute as a legal matter that S.B. 200 eliminated the prohibition of partisan gerrymandering, the mandatory neutral redistricting criteria, and the enforcement mechanism, or that it allowed the Legislature to reject the Independent Commission's maps without explanation. Thus, in this appeal, Defendants have not challenged Plaintiffs' contentions as to how S.B. 200 impaired the reforms in Proposition 4.

3. The District Court Concluded that Count V Did Not Allege a Legally Cognizable Violation of the Initiative Provision or the Alter or Reform Clause

¶88 Although there has been no dispute about the effect of S.B. 200 on Proposition 4, the district court concluded that this second element was not met based on the legislative power in general. In other words, the court concluded that the Legislature's repeal and replacement of Proposition 4 did not violate the Initiative Provision or the Alter or Reform Clause because the

Legislature is empowered to amend or repeal any statute, including an initiative.

¶89 In ruling on Defendants' motion to dismiss Count V, the district court was faced with questions of first impression that we have never directly analyzed. Looking to our precedent, the district court noted that we have said "[t]he initiative power of the people is . . . parallel and coextensive with the power of the legislature." (Emphasis omitted.) (Quoting *Carter*, 2012 UT 2, ¶ 22.) And the court reasoned that although the Utah Constitution "unequivocally recognizes the importance of . . . citizens' right to initiate legislation to alter or reform their government," it also vests the Legislature with power to "amend and repeal legislation enacted by citizen initiative, without limitation." So "even accepting [Plaintiffs'] factual allegations as true," the court concluded that "the Legislature did not act unconstitutionally by either substantially amending or effectively repealing Proposition 4." On this basis, the court concluded that the Legislature's repeal and replacement of Proposition 4 violated neither the Initiative Provision nor the Alter or Reform Clause as a matter of law. Accordingly, it dismissed Count V for failure to state a claim on which relief could be granted.

¶90 Defendants argue that the district court's analysis was correct. They assert that "when the people legislate through the Initiative [Provision], they are exercising a particular form of legislative power that can later be amended or repealed through another exercise of legislative power." For this reason, Defendants argue that the Legislature can repeal or amend any statute without limitation, including a citizen initiative—regardless of whether the citizen initiative reforms the government.

¶91 Plaintiffs urge us to reverse the district court's conclusion. They assert that the text, structure, and history of the relevant constitutional provisions make clear that the Legislature cannot nullify a citizen initiative. And because S.B. 200 repealed Proposition 4, Plaintiffs argue that Count V makes out a cognizable claim for relief under the Initiative Provision. Plaintiffs argue further that, "Even were the Legislature empowered to modify some types of citizen-enacted legislation, that power does not extend to citizen-enacted legislation that alters or reforms governmental structures, as Prop 4 indisputably did." On this basis, they argue that S.B. 200 also violates the Alter or Reform Clause.

¶92   In Plaintiffs' view, the text and history of article I, section 2 show that it protects the people's right, as sovereigns, to alter or reform their government within the bounds of the constitution. And they argue that the people's exercise of this right cannot be negated based on the Legislature's general power to amend and repeal statutes. The alternative would "subjugate the people to the unchecked whims of the Legislature," "effectively nullify the people's article VI, section 1 power by giving the Legislature a veto over citizen initiatives," and "negate article I, section 2, which grants the people the primary governmental power and protects their prerogative to alter or reform their government." Plaintiffs therefore contend that were we to uphold the district court's dismissal of Count V, we would render these constitutional guarantees "a dead letter."

¶93   Plaintiffs argue that both the Initiative Provision and the Alter or Reform Clause restrict legislative action when it is in tension with these constitutional rights. First, Plaintiffs argue that the Initiative Provision, on its own, requires reversal of the district court's dismissal of Count V. They assert that because the Initiative Provision does not contain language allowing the Legislature to repeal a citizen initiative, the Legislature violates that provision if it does so in a manner that nullifies the substance of the initiative in question.

¶94   Whether the Initiative Provision, standing alone, prohibits the Legislature from repealing a citizen initiative is a question of first impression. We have addressed circumstances in which initiative proponents have challenged the Legislature's regulation of the *process* of getting an initiative on the ballot. *See, e.g.*, *Gallivan v. Walker*, 2002 UT 89, ¶¶ 28, 64, 54 P.3d 1069 (holding that the Legislature may not "pass laws that unduly burden or diminish the people's right to initiate legislation" and concluding that a law that contained a multi-county signature requirement for placing an initiative on the ballot was unconstitutional). We have also held that the Legislature cannot substantively restrict the scope of the initiative right. *See Sevier Power*, 2008 UT 72, ¶¶ 9–11 (holding that the Legislature did not have constitutional authority to limit the scope of what laws could be introduced by initiative). But we have

never opined on the constitutionality of the Legislature repealing or amending an initiative that has been enacted by the voters.[18]

¶95 Similarly, we have never been presented with the second argument advanced by Plaintiffs: whether, at a minimum, the constitution prohibits the Legislature from impairing a government-reform initiative by amending, repealing, or replacing it.

¶96 Based on our determination that the two rights are interconnected in this case, we focus our analysis on Plaintiffs' second argument. But we also do so as a matter of constitutional avoidance. The second argument presents a constitutional question that is narrower in scope. And because we conclude that this argument requires us to reverse, we do not reach the broader question of whether the Initiative Provision alone prohibits the repeal and/or substantive amendment of all citizen initiatives, whether they reform the government or not. *See Lyon v. Burton*, 2000 UT 19, ¶ 10, 5 P.3d 616 ("[T]his Court should avoid addressing constitutional issues unless required to do so." (cleaned up)).

¶97 As an initial matter, we agree with Defendants that legislative power generally includes the power to amend and repeal existing statutes. *See Legislative Power*, Black's Law Dictionary (11th ed. 2019) ("The power to make laws and to alter them; a legislative body's exclusive authority to make, amend, and repeal laws."); *see also* 16 C.J.S. *Constitutional Law* § 383 (2024) ("Generally speaking, legislative power is the power to make, amend, or repeal laws, while executive power is the power to enforce the laws, and judicial power is the power to interpret and apply the laws to actual controversies."). And, of course, a citizen initiative, if approved by a majority of voters, becomes a statute. When Utah voters approved Proposition 4, the result was the "Utah

---

[18] In *Grant v. Herbert*, the petitioners sought extraordinary relief after the Legislature replaced, during a special session, an initiative that legalized medical cannabis. 2019 UT 42, ¶¶ 1–2, 449 P.3d 122. However, in that case we did not address the question presented here. There, the petitioners argued that the governor had effectively vetoed the initiative when he called a special session of the Legislature. *Id.* ¶ 21. We rejected that claim and did not opine on the Legislature's constitutional authority to amend or repeal laws passed by initiative. *Id.* ¶ 35.

Independent Redistricting Commission and Standards Act," found in Utah Code sections 20A-19-101 to -301 (2018).

¶98 But this is not dispositive of Count V. Plaintiffs allege that in enacting Proposition 4, Utah voters did more than just pass a law. They exercised constitutional rights. Specifically, Plaintiffs allege that Utahns used their constitutional right to initiate legislation to exercise another constitutional right—their right to alter or reform the government. And Plaintiffs allege that Defendants did more than just repeal a law. They allege that in replacing Proposition 4 with S.B. 200, Defendants violated the people's exercise of those rights.

¶99 While the Legislature has authority to amend and repeal statutes, it does not necessarily follow that it can do so in a manner that unduly treads upon constitutional rights. We reiterated this principle in the context of the Open Courts Clause, explaining:

> We are simply not at liberty to eviscerate a mandatory provision of our Declaration of Rights by limiting our analysis to [the legislative power] alone. That kind of analysis would result in the legislative power prevailing in every case, and would deprive the constitutional rights embraced in [article I,] section 11 of any meaningful content or force. If we are free to refuse to give substance and meaning to section 11 because it stands in tension with the power of the Legislature to adjust conflicting interests and values in society, we could as well emasculate every provision in the Declaration of Rights by the same method of analysis. We decline to do that.

*Berry ex rel. Berry v. Beech Aircraft Corp.*, 717 P.2d 670, 678–79 (Utah 1985) (discussing UTAH CONST. art. I, § 11).[19]

---

[19] We have since repudiated applications of the Open Courts Clause that did not give due deference to the Legislature's prerogative to set policy. *See Judd v. Drezga*, 2004 UT 91, ¶ 15, 103 P.3d 135. But the point we made in *Berry* remains true: in cases involving a claim that legislation infringes a constitutional right, we would debilitate that right by limiting our analysis to the scope of legislative power alone. *See Berry ex rel. Berry v. Beech Aircraft Corp.*, 717 P.2d 670, 679 (Utah 1985).

¶100  To determine whether Plaintiffs have alleged a cognizable claim that Defendants violated the people's right to reform the government through a citizen initiative, we interpret article I, section 2, which enshrines the people's sovereign power and contains the Alter or Reform Clause, and the Initiative Provision, which is found in article VI, subsections 1(1)(b) and (2). We must determine whether these provisions—taken together—place any constitutional limits on the Legislature's power to amend, repeal, or replace a citizen initiative that reforms the government. We conclude that they do.

*C. The Original Public Meaning of Article I, Section 2 and the Initiative Provision*

¶101  "When we interpret constitutional language, we start with the meaning of the text as understood when it was adopted." *South Salt Lake City v. Maese*, 2019 UT 58, ¶ 18, 450 P.3d 1092. "[O]ur focus is on the objective original public meaning of the text, not the intent of those who wrote it." *Id.* ¶ 19 n.6. Although evidence of the framers' intent can help with this endeavor, when we use such material—for example, transcripts from the constitutional convention on a particular topic—we have clarified that this is "only a means to this end, not an end in itself." *Id.* So, we "interpret the [c]onstitution according to how the words of the document would have been understood by a competent and reasonable speaker of the language at the time of the document's enactment." *Id.* (cleaned up). And we have clarified that when we interpret language from early statehood, we do so according to the "general public understanding" at the time. *Id.* ¶ 21 n.7.

¶102  In this case, the parties do not argue about the original public meaning of particular words in either of the provisions at issue—at least, not in linguistic terms. Rather, their debate centers on how Utahns would have understood the *scope* of the rights enshrined in the Initiative Provision and the Alter or Reform Clause, and specifically how those rights retained by the people would interact with the powers they had assigned to the Legislature.

¶103  Given the parties' arguments here, we turn directly to the historical record. *See id.* ¶ 23 ("Where doubt exists about the constitution's meaning, we can and should consider all relevant materials."); *Am. Bush*, 2006 UT 40, ¶ 10 ("[W]e recognize that constitutional language is to be read not as barren words found in a dictionary but as symbols of historic experience illumined by the

presuppositions of those who employed them." (cleaned up)). We take the disputed constitutional provisions in turn, assess the historical context in which they were ratified, and determine what they would have meant to Utahns at the time.

¶104 We begin chronologically, with article I, section 2. We conclude that the Alter or Reform Clause enshrined a fundamental right of the people to alter or reform their government within the bounds of the constitution as a whole. We then turn to the Initiative Provision in article VI, subsections 1(1)(b) and (2), which was added to the constitution through an amendment four years after Utah's founding. We conclude that the initiative power was understood as an important means of directly enacting the people's will on specific issues, particularly when the people felt their elected representatives were not doing what the people wanted with respect to those issues. Analyzing the two rights together, we conclude that the Initiative Provision provides the people with a direct, legislative means of exercising their right to reform the government, which they had retained in article I, section 2. When these two constitutional provisions are exercised in this manner—within the bounds of the constitution and the legislative power—we conclude that they are constitutionally protected from government infringement, including legislative action that impairs the government reform contained in an initiative, and that they therefore establish a legally cognizable claim for their violation.

1. In Article I, Section 2, Utahns Enshrined Their Sovereign Authority and Retained for Themselves a Constitutionally Protected Right to Alter or Reform Their Government

¶105 Article I, section 2 has been in our state constitution, in the same form, since Utah became a state in 1896. That provision says:

> All political power is inherent in the people; and all free governments are founded on their authority for their equal protection and benefit, and they have the right to alter or reform their government as the public welfare may require.

UTAH CONST. art. I, § 2.

¶106 Article I, section 2 is one sentence containing three clauses. The first clause, "All political power is inherent in the people," enshrines the principle that the people hold the power of the sovereign in a constitutional republic. *Id.* The second clause states that "all free governments are founded on [the people's]

authority for their equal protection and benefit." *Id.* This describes the nature of "free governments," which, as we discuss, stands in contrast to monarchical, despotic, or tyrannical governments. The third clause—the Alter or Reform Clause—provides that the people "have the right to alter or reform their government as the public welfare may require." *Id.*

¶107 While the Alter or Reform Clause is at the heart of the issue before us, we analyze the historical public understanding of all three clauses of article I, section 2. The first two clauses provide important context to the Alter or Reform Clause. They are the foundation on which the Alter or Reform Clause is built. Without the people's inherent sovereign authority, they would not have had the power to retain for themselves the right to reform their government. For that reason, an understanding of the Alter or Reform Clause would be incomplete without an appreciation of article I, section 2 as a whole.

¶108 Our task is to uncover Utahns' understanding, at the time of our state's founding, of the principles at play in article I, section 2, including specifically the Alter or Reform Clause. In conducting this analysis, we first track the development and evolution of the concepts underlying article I, section 2 leading up to that point. *See Neese v. Utah Bd. of Pardons & Parole*, 2017 UT 89, ¶¶ 96–98, 416 P.3d 663 (explaining that an original public meaning analysis requires "deep immersion in the shared linguistic, political, and legal presuppositions and understandings of the ratification era").

¶109 As we will discuss in more depth, by the time of Utah's founding, the principles embodied in article I, section 2 already had a long history. So first, we briefly discuss the development of these ideas during the Enlightenment period in Europe, before they crossed the Atlantic and inspired our nation's founders.

¶110 We then discuss the role these concepts played during the American Revolution. Then we move on to the post-revolutionary period in America, after Americans won their independence from Britain and the new nation and the states within it adopted their own constitutions.

¶111 We ultimately arrive at the time of Utah's founding. By that point, much of the language of article I, section 2 could be found, in one form or another, in almost all the state constitutions that preceded Utah's. Thus, in drafting article I, section 2, the

framers of our constitution were drawing upon familiar terms. And when a body, such as the 1895 constitutional convention, uses language from other sources, we at times assume "they intended to not only adopt that language, but to import the 'cluster of ideas' that surrounds that language." *Maese*, 2019 UT 58, ¶ 27 n.10 (cleaned up). As we will explain, by 1896, as the people of the United States and the increasing number of states within it lived under constitutions founded on the sovereign authority of the people, article I, section 2, and specifically the Alter or Reform Clause, became synonymous with the people's right to reform their government through constitutional means. This was the public understanding of the right to alter or reform the government at the time of Utah's founding. And our analysis of the original public meaning of the Alter or Reform Clause of article I, section 2 persuades us that it was understood to be a fundamental right, enforceable against the government, when exercised by the people within the bounds of the Utah Constitution.

*The Meaning of Article I, Section 2 in Historical Context:*
*The Enlightenment*

¶112 In various forms and to different degrees, the philosophical underpinnings of article I, section 2 can be traced back at least to Ancient Greece.[20] These ideas were then refined in the seventeenth and eighteenth centuries by political philosophers such as John Locke and Jean-Jacques Rousseau,[21] before being re-invigorated and implemented by the founders of our nation.

¶113 The concept of governments being founded on the inherent authority of the people grew out of what Enlightenment

---

[20] *See, e.g.*, PLATO, *Crito*, *in* THE FOUR SOCRATIC DIALOGUES OF PLATO 112 (Benjamin Jowett trans., Oxford Univ. Press 1903) (c. 360 B.C.E.); PLATO, THE REPUBLIC OF PLATO bk. II, at 66–67 (Alexander Kerr trans., Charles H. Kerr & Co. 1918) (c. 375 B.C.E.); DIOGENES LAERTIUS, *Epicurus*, *in* LIVES OF EMINENT PHILOSOPHERS 528, 675 (R.D. Hicks trans., G.P. Putnam's Sons 1925) (principal doctrines 32–33); R.D. HICKS, STOIC AND EPICUREAN 177–78 (Charles Scribner's Sons 1910) (describing relevant aspects of Epicurean philosophy).

[21] *See generally* JOHN LOCKE, *Second Treatise*, *in* TWO TREATISES ON CIVIL GOVERNMENT 191–320 (George Routledge & Sons 1884) (1689); JEAN-JACQUES ROUSSEAU, THE SOCIAL CONTRACT 59–62 (Maurice Cranston trans., Penguin Books 1968) (1762).

philosophers described as individuals' transition from a "state of nature"—a social fiction where individuals largely reside outside any political order and are governed primarily by natural laws of self-preservation—into a formal political society.[22] To Locke, in a state of nature, and in line with theories of natural law,[23] people were born with "perfect freedom and an uncontrolled enjoyment of all the rights and privileges of the law of Nature," including "a power not only to preserve [their] property—that is, [their] life, liberty, and estate . . . , but to judge of and punish the breaches of that law in others." JOHN LOCKE, *Second Treatise, in* TWO TREATISES ON CIVIL GOVERNMENT 191, 234 § 87 (George Routledge & Sons 1884) (1689). While political philosophers had their own ideas about what the state of nature entailed, they generally agreed on the purpose behind a peoples' shift toward collective society under civil government—that the formation of a society and government among a group of people was sought to provide greater protection and justice for both the individual and the community as a whole, as well as to facilitate an increasing interdependence among one another, which an anarchical state of nature could less adequately provide.[24]

---

[22] *See* ROUSSEAU, *supra* note 21, at 59 ("I assume that men reach a point where the obstacles to their preservation in a state of nature prove greater than the strength that each man has to preserve himself in that state. Beyond this point, the primitive condition cannot endure, for then the human race will perish if it does not change its mode of existence.").

[23] *See* David C. Williams, *The Constitutional Right to "Conservative" Revolution*, 32 HARV. C.R.-C.L. L. REV. 413, 419 (1997) ("In contrast to constitutional rights, within the Enlightenment tradition in general and social contract theory in particular, natural rights are those rights that belong to all individuals at all times and places by virtue of being human.").

[24] *See* ROUSSEAU, *supra* note 21, at 59–60, 62 ("[T]he only way in which [people] can preserve themselves is by uniting their separate powers in a combination strong enough to overcome any resistance, uniting them so that their powers are directed by a single motive and act in concert. . . . Those who are associated in [a society] take collectively the name of *a people*, and call themselves individually *citizens*, in so far as they share in the sovereign power,

(continued . . .)

¶114 Locke stressed the need for voluntary consent from the people in legitimizing any civil government under which they might form a society, which would require greater cooperation and obedience to the society's laws. In his 1689 TWO TREATISES ON CIVIL GOVERNMENT, Locke penned:

> Men being . . . all free, equal, and independent, no one can be put out of this estate and subjected to the political power of another without his own consent, which is done by agreeing with other men, to join and unite into a community for their comfortable, safe, and peaceable living, one amongst another, in a secure enjoyment of their properties, and a greater security against any that are not of it. . . . When any number of men have so consented to make one community or government, they are thereby presently incorporated, and make one body politic, wherein the majority have a right to act and conclude the rest.

*Id.* at 240–41, § 95.

¶115 "Government in a Lockean society is the product of a compact among people." Donald L. Doernberg, *"We the People": John Locke, Collective Constitutional Rights, and Standing to Challenge Government Action*, 73 CAL. L. REV. 52, 60 (1985). But while "[g]overnment is [indeed] the creation of such a compact, . . . it is not a party to the compact." *Id.* at 60–61. Rather, while "contractually related to each other, the people are not contractually obliged to government, and governors benefit from governing only as fellow members of the [body politic]. They are merely deputies for the people, trustees who can be discarded if they fail in their trust." Peter Laslett, *Introduction* to JOHN LOCKE,

---

and *subjects*, in so far as they put themselves under the laws of the state."); A. John Simmons, *Locke's State of Nature*, 17 POL. THEORY 449, 458 (1989) ("[For Locke,] [w]here there is no common judge with authority, men may be partial or vengeful in exercising their natural executive rights, possibly leading to feuds, conflicts, and war . . . . This kind of social problem plagues all forms of the state of nature, and the insecurity it causes is the primary reason for seeking the protection of a (properly limited) civil government . . . .").

TWO TREATISES OF GOVERNMENT 113 (Cambridge Univ. Press 1963) (1689).

¶116  Thus, for Enlightenment thinkers, the concept of popular sovereignty was associated with the idea that through their collective agreement, the people had the inherent authority to establish a government, and consequently, to abolish it and reinstitute an improved one if the government strayed beyond the bounds set by the people.

### *The American Revolution*

¶117 Almost a century later, these principles inspired the American colonists' revolution against British rule. Our nation's Declaration of Independence states:

> Governments are instituted among Men, deriving their just powers from the consent of the governed, — That whenever any Form of Government becomes destructive of these ends, it is the Right of the People to alter or to abolish it, and to institute new Government, laying its foundation on such principles and organizing its powers in such form, as to them shall seem most likely to effect their Safety and Happiness.

THE DECLARATION OF INDEPENDENCE para. 2 (U.S. 1776).

¶118  Prior to this, "[t]he traditional model of government that Americans inherited . . . rested on a hypothetical bargain" where "the people were protected by the monarch in exchange for the people giving the king allegiance." CHRISTIAN G. FRITZ, AMERICAN SOVEREIGNS: THE PEOPLE AND AMERICA'S CONSTITUTIONAL TRADITION BEFORE THE CIVIL WAR 13 (2008). And in our founders' view, King George III had "breach[ed] his implied duty of protection under that contract, thereby releasing the people in the colonies from their allegiance," giving "rise to the subjects' right of revolution." *Id.* Indeed, "[o]n the eve of the Revolution, Alexander Hamilton justified American resistance as an expression of 'the law of nature' redressing violations of 'the first principles of civil society' and invasions of 'the rights of a whole people.'" *Id.* The Declaration of Independence "was the last-ditch effort of an oppressed people" and "demonstrated that Americans were justified in exercising the natural law right of revolution." *Id.*

¶119  This "theory of popular sovereignty" later "established a basic premise in American political life: that political legitimacy

ultimately rested with the consent of the people." Christian G. Fritz, *Popular Sovereignty, Vigilantism, and the Constitutional Right of Revolution*, 63 PAC. HIST. REV. 39, 44 (1993).

*State Constitution-Making*

¶120 These sentiments were front and center in the eighteenth and nineteenth centuries, after Americans had won their independence from England and the people in numerous states went about forming their own governments by drafting and ratifying state constitutions. State constitution writers of the time "freely used Lockean rhetoric regarding nature, consent, and limited government to explain their allegiance to popular sovereignty." Laura J. Scalia, *The Many Faces of Locke in America's Early Nineteenth-Century Democratic Philosophy*, 49 POL. RSCH. Q. 807, 809 (1996). Indeed, "all of the original constitutions [adopted in the eighteenth century] declared that the people were sovereign and the source of government power." Jessica Bulman-Pozen & Miriam Seifter, *The Democracy Principle in State Constitutions*, 119 MICH. L. REV. 859, 881 (2021).

¶121 As the years passed and more states joined the Union, almost every state constitution included "an express commitment to popular sovereignty," often formulated by declaring "that 'all political power is inherent in the people,'" "or that government 'originates with the people' or derives its power 'from the consent of the governed.'" *Id.* at 869–70. And critically, the "idea of popular sovereignty [was] linked not only to the people's initial creation of state constitutions but also to their ongoing right to change them: most state constitutions expressly refer to the right of the people to 'alter' . . . the very constitutions and governments they create." *Id.* at 870.

¶122 This concept of the right of the people to "alter" their government through constitutional mechanisms was a departure from older ideas about the natural right to revolt against tyranny — as the right to "alter or abolish" a despotic government had meant to our nation's founders. And this made sense, given that "[t]he constitutional logic of recognizing the people, not a king, as the sovereign implied the irrelevance of a right of revolution in America." FRITZ, *supra* ¶ 118, at 24. Instead, "[t]he alter or abolish provisions of the first state constitutions reflected an American understanding that the people in a republic, like a king in a monarchy, exercised plenary authority as the sovereign." *Id.* at 27. In other words, state constitutional provisions establishing the

people's right to alter, abolish, or reform their government no longer embodied the natural right of revolution against tyranny, because the people had no need to revolt against themselves. Rather, these provisions expressed the new reality in post-revolutionary America that "as the collective sovereign, Americans . . . possessed the inherent right to revise their constitutions." *Id.* at 28.

¶123 Consider how courts interpreted these provisions near the time of Utah's founding. In *Wells v. Bain*, the Supreme Court of Pennsylvania interpreted "the second section of the declaration of rights of the Constitution of Pennsylvania, which affirms that the people 'have at all times an inalienable and indefeasible right to alter, reform or abolish their government in such manner as they may think proper.'" 75 Pa. 39, 46 (1873). The court explained that this provision enshrined the "axiom of the American people, that all just government is founded in the consent of the people," and that "an existing lawful government of the people cannot be altered or abolished unless by the consent of the same people." *Id.* The alter or reform language further encompassed the people's right to alter the government using "[t]he mode provided in the existing constitution . . . or by passing a law to call a convention." *Id.* at 47. And these were the "only means through which an *authorized* consent of the whole people, the entire state, [could] be lawfully obtained in a state of peace." *Id.*

¶124 The Iowa Supreme Court reached similar conclusions. In *Koehler v. Hill*, the court considered Iowa's alter or reform provision: "All political power is inherent in the people. Government is instituted for the protection, security, and benefit of the people; and they have the right at all times to alter or reform the same, whenever the public good may require." 15 N.W. 609, 614–15 (Iowa 1883) (quoting IOWA CONST. art. I, § 2). As the court said,

> These principles are older than constitutions and older than governments. The people did not derive the rights referred to from the constitution, and, in their nature, they are such that the people cannot surrender them. . . . But let us consider how these rights are to be exercised in an organized government. The people of this state have adopted a constitution which specifically designates the modes for its own amendment.

*Id.* at 615.

¶125 The court then presented a useful hypothetical. "Suppose, however, a part of the people conclude that the public good requires an alteration or reformation in the government, and they set about the adoption of a new constitution in a manner not authorized in the old one." *Id.* While the court acknowledged that the new order would technically "alter or reform" the government to the extent the changes were maintainable, it observed that the effort would have been "exercised not under the constitution, but in disregard and independently of it." *Id.* And "[n]o heresy has ever been taught in this country so fraught with evil as the doctrine that the people have a constitutional right to disregard the constitution." *Id.* So, as the Iowa Supreme Court saw it, the alter or reform provision found within the Iowa Constitution no longer corresponded to a natural right of revolt. We could not agree more.

¶126 Thomas Cooley, "the preeminent authority of the late nineteenth century on state constitutional matters," *Am. Bush*, 2006 UT 40, ¶ 13, also viewed the people's right to "alter," "reform," or "abolish" their government as being bounded by the constitutions ratified by the people themselves. He wrote in 1868,

> [T]he power to amend or revise [state] constitutions resides in the great body of the people as an organized body politic, who, being vested with ultimate sovereignty, and the source of all State authority, have power to control and alter the law which they have made at their will.
>
> . . .
>
> But the will of the people to this end can only be expressed in the legitimate modes by which such a body politic can act, and which must either be prescribed by the constitution whose revision or amendment is sought, or by an act of the legislative department of the State, which alone would be authorized to speak for the people upon this subject, and to point out a mode for the expression of their will in the absence of any provision for amendment or revision contained in the constitution itself.

THOMAS M. COOLEY, A TREATISE ON THE CONSTITUTIONAL LIMITATIONS WHICH REST UPON THE LEGISLATIVE POWER OF THE STATES OF THE AMERICAN UNION 31 (Little, Brown, & Co. 1868).

*Utah's Founding*

¶127 So foundational and familiar were the concepts of popular sovereignty, the necessity of the consent of the governed, and the people's right to reform their government, that each was included in the first Constitution of the State of Deseret[25] in 1849. It read in relevant part:

> All political power is inherent in the people, and all free governments are founded in their authority, and instituted for their benefit; therefore, they have an inalienable and indefeasible right to institute government, and to alter, reform, and totally change the same when their safety, happiness, and the public good shall require it.

CONST. OF THE STATE OF DESERET art. VIII, § 2 (1849).

¶128 During another attempt at statehood in 1887, the president of that constitutional convention, John T. Caine, stated the following:

> Our authority to act in these most important matters comes from the people. Under the institutions of this republic, the people are the source of all political power. This principle of popular sovereignty is fundamental to the system of government under which we live. It is the very essence of true republicanism, the vital breath of pure democracy. In the United States[,] the men who occupy the position

---

[25] When the first members of the Church of Jesus Christ of Latter-day Saints settled in Utah in 1847, the land was part of Mexican territory. JEAN BICKMORE WHITE, CHARTER FOR STATEHOOD: THE STORY OF UTAH'S STATE CONSTITUTION 19 (1996). This changed the next year when the Mexican-American War ended and the area was ceded from Mexico to the United States under the Treaty of Guadalupe Hidalgo. *Id.* In 1849, church leaders sought statehood for the region. *Id.* at 20. They submitted the Constitution of the State of Deseret to Congress, along with a memorial requesting statehood. *Id.* Congress ultimately rejected the request in 1850, instead granting territorial status to the "Utah Territory." *Id.* at 21. In the interim, the provisional State of Deseret had functioned under the Constitution of the State of Deseret from December 1849 until it was dissolved in March 1851. *Id.* at 19–22.

> of rulers are but the servants of the sovereign people.
> They govern in that capacity and therefore the people
> are really self-governed.

*The Constitutional Convention: The Body Organizes and Begins Work*,
DESERET NEWS, July 6, 1887, at 4.

¶129 And in Utah's final, successful attempt at statehood in 1895,[26] these same principles were enshrined in article I, section 2 of our constitution's Declaration of Rights, providing that: "All political power is inherent in the people; and all free governments are founded on their authority for their equal protection and benefit, and they have the right to alter or reform their government as the public welfare may require." UTAH CONST. art. I, § 2.

¶130 Placing this article in the Declaration of Rights was a conscious choice. One delegate argued against its inclusion in the Declaration of Rights because it was "simply affirming and reaffirming a principle that there is no necessity of." PROCEEDINGS & DEBATES OF THE CONVENTION ASSEMBLED TO ADOPT A CONSTITUTION FOR THE STATE OF UTAH, DAY 17, at 230, https://le.utah.gov/documents/conconv/17.htm (statement of Mr. Varian). But this view did not prevail. Heber Wells, the Chairman of the Committee on the Preamble and Declaration of Rights during the 1895 convention, presented this provision on the convention floor and argued, "I think when it comes to a matter of a declaration of rights, that it is very pertinent to provide that all political power is inherent in the people." *Id.* (statement of Mr. Wells). Chairman Wells's view won out.

*The Public Meaning of Article I, Section 2 at the Time of Utah's Founding*

¶131 With this historical context, we can draw the following conclusions about the understanding of the principles enshrined in article I, section 2 when it was placed in our state constitution. By 1895, when our constitution was ratified, it was widely understood that "the people are the source of all political power," and that the

---

[26] The constitutional convention that finally resulted in statehood for Utah was held in 1895. *See* Maren Peterson, *Utah's Road to Statehood: 125 Years*, UTAH DIV. ARCHIVES & RECS. SERV. (Jan. 4, 2021), https://archivesnews.utah.gov/2021/01/04/utahs-road-to-statehood-125-years/. Utah was granted statehood in 1896. *Id.*

individuals "who occupy the position of rulers are but the servants of the sovereign people." *The Constitutional Convention: The Body Organizes and Begins Work*, DESERET NEWS, July 6, 1887, at 4 (quoting statement of John T. Caine, president of Utah's 1887 constitutional convention). This was viewed as "the very essence of true republicanism." *Id.* And the very legitimacy of a "free government" rested upon the consent of the governed.

¶132 Our caselaw has emphasized these principles over the years. Justice Larson recognized in 1937 that "the people themselves are not creatures or creations of the Legislature. They are the father of the Legislature, its creator, and in the act [of] creating the Legislature the people provided that its voice should never silence or control the voice of the people in whom is inherent all political power." *Utah Power & Light Co. v. Provo City*, 74 P.2d 1191, 1205 (Utah 1937) (Larson, J., concurring). He observed further that "the Legislature, the child of the people, cannot limit or control its parent, its creator, the source of all power." *Id.*

¶133 Justice Larson echoed these sentiments a year later in *Utah Power & Light Co. v. Ogden City*, stating:

> [The people] declared in no uncertain terms that "all political power is inherent in the people," that "governments derive their powers from the consent of the governed," and that a frequent recurrence to these fundamental principles is essential to the perpetuity of free government. These declarations are not mere metaphors, sounding brass and tinkling cymbals pleasing to the ear, but a vital princip[le] adhered to in the formation of the government of this state. . . . The people set up the state as their agent or servant through which they might for convenience express their sovereign will. They created the state; the state did not create the people. . . . The people are sovereign; the state is merely their instrument through which they exercise part of their sovereign will. Confusion results if we fail to distinguish between sovereignty itself and that force which stands as the representative of the sovereign power. . . . The right of self-government should be carefully guarded and every infraction or evasion thereof condemned.

79 P.2d 61, 74 (Utah 1938) (Larson, J., concurring in part and dissenting in part) (cleaned up) (quoting UTAH CONST. art. I, § 2). *See generally id.* at 72–77. And while Justice Larson's observations appeared in separate opinions, we have cited them favorably over the years in majority opinions. *See, e.g.*, *Carter*, 2012 UT 2, ¶¶ 21 n.9, 22 n.10, 27; *Gallivan*, 2002 UT 89, ¶ 23.

¶134  It was also understood at the time of our state's founding that hand in hand with the people's sovereign power came the people's right to alter or reform the government they had created. This idea had a long history, beginning as the philosophical underpinning of the right to revolt against tyrants and despots. *See supra* ¶¶ 112–19. But after the American Revolution, as Americans lived under national and state republican governments in which the people, rather than a monarch, were sovereign, this right came to mean that the people had the authority to reform or change their governments at any time—whether preceded by tyranny and oppression or not, within the bounds of their existing state constitutions.

¶135  The drafters of the Utah Constitution made a conscious choice to include these principles in the Declaration of Rights. Far from "simply affirming and reaffirming a principle that there is no necessity of," PROCEEDINGS & DEBATES OF THE CONVENTION ASSEMBLED TO ADOPT A CONSTITUTION FOR THE STATE OF UTAH, DAY 17, *supra* ¶ 130, at 230, (statement of Mr. Varian), article I of our constitution is "a declaration of those rights felt by the drafters of the document to be of such importance that they be separately described," *Sevier Power*, 2008 UT 72, ¶ 5. But given that the people themselves had framed and ratified the constitution, the right to alter or reform the government enshrined within it was to be read in harmony with the document as a whole.

¶136 Thus, the founding generation of Utahns would have understood that the Alter or Reform Clause established a constitutional right to reform their government, within constitutional bounds. At the time of our state's founding, this meant that the people could either amend the constitution as provided in article XXIII, section 1, or vote to call a constitutional convention under article XXIII, section 2 to make more significant revisions to the constitution (including adopting an entirely new constitution). Notably, both provisions required that proposed constitutional amendments or constitutional conventions originate in the Legislature before being voted on by the people. *See* UTAH

CONST. art. XXIII, § 1 ("Any amendment or amendments to this Constitution may be proposed in either house of the Legislature, and if two-thirds of all the members elected to each of the two houses, shall vote in favor thereof ... said amendment or amendments shall be submitted to the electors of the state for their approval or rejection . . . .); *id.* art. XXIII, § 2 ("Whenever two-thirds of the members, elected to each branch of the Legislature, shall deem it necessary to call a convention to revise or amend this Constitution, they shall recommend to the electors to vote . . . for or against a convention . . . .").[27]

¶137 Soon thereafter, however, Utahns amended the constitution to explicitly retain for themselves a direct means of exercising their sovereign authority and their reform right through legislation.

2. Article VI, Section 1 Provides Direct Legislative Power to the People, Which They Intended to Be Meaningful and Effective

¶138 In 1900, four years after Utah obtained statehood, the people of Utah ratified an amendment to article VI, section 1 of the constitution. It reads, in relevant part,

> (1) The Legislative power of the State shall be vested in:
>
>> (a) a Senate and House of Representatives which shall be designated the Legislature of the State of Utah; and
>>
>> (b) the people of the State of Utah as provided in Subsection (2).

And subsection 1(2), in turn, dictates how the people can exercise their power to "initiate any desired legislation and cause it to be submitted to the people for adoption upon a majority vote," or to

---

[27] The people could also vindicate the principles of article I, section 2 in court. *See* UTAH CONST. art. VIII, § 2 ("The court shall not declare any law unconstitutional under this constitution or the Constitution of the United States, except on the concurrence of a majority of all justices of the Supreme Court."); *Richards v. Cox*, 2019 UT 57, ¶ 40, 450 P.3d 1074 ("We do not abrogate our duty to interpret and apply the mandates of the constitution.").

"require any law passed by the Legislature . . . to be submitted to the voters" before it takes effect.[28]

¶139 As with the Alter or Reform Clause, Utahns' understanding of the Initiative Provision is informed by the context in which it was enacted. So we again study the historical record for evidence of original public meaning. And we conclude that when Utahns amended the constitution four years after statehood to add the Initiative Provision, they understood that their direct legislative power would be meaningful and effective, and that it would provide the people with a check on the Legislature in times of disagreement.

¶140 At the time of our nation's founding, the proper role of the people in governance was a subject of debate. The founders of the United States held competing concerns. "Having fought a revolution against monarchy, they were committed to the principle that all legitimate power flows from the people . . . ." KENNETH P. MILLER, DIRECT DEMOCRACY AND THE COURTS 19 (2009). But the founders also "feared unchecked popular rule." *Id.* at 20 (citing THE FEDERALIST No. 49 (Alexander Hamilton or James Madison)). Alexander Hamilton described the conundrum as follows: "Give all power to the many, and they will oppress the few," but "[g]ive all power to the few, and they will oppress the many." Alexander Hamilton, Speech in the Federal Convention (June 18, 1787), *in* 1 THE WORKS OF ALEXANDER HAMILTON 381, 389 (Henry Cabot Lodge ed., G.P. Putnam's Sons 1904). In structuring the federal government, the founders gave greater weight to the protection of the few from the many by settling on a "republican" form of government, which, in some founders' minds, meant the "total exclusion of the people, in their collective capacity, from any share" in governmental administration. THE FEDERALIST No. 63 (James Madison). In this representative form of government, the people still exercised their inherent power, but only indirectly through their representatives.

---

[28] Article VI, section 1 has changed very little since its enactment in 1900. Besides non-substantive amendments, the Initiative Provision was amended in 1998 to require a two-thirds vote for initiatives regarding "the taking of wildlife or the season for or method of taking wildlife." UTAH CONST. art. VI, § 1(2)(a)(ii) (1998).

¶141 But a century later, during what was referred to as the "Progressive Era," which spanned roughly from the early 1890s into the 1920s, many states saw the pendulum swing in the direction of greater direct control for the people over their government. It was a time when public distrust of elected representatives ran high, and many believed that "unreformed state legislatures and political parties were corrupt, beholden to moneyed interests and trusts." SHAUN BOWLER ET AL., CITIZENS AS LEGISLATORS: DIRECT DEMOCRACY IN THE UNITED STATES 2 (1998) (cleaned up). The Progressive movement was "based on the premise that only free, unorganized individuals could be trusted and that any intermediary body such as politicians, political parties and legislative bodies were inherently corrupt and distorted the public interest." *Carter*, 2012 UT 2, ¶ 23 (cleaned up).

¶142 In response to these concerns, people in twenty-four states adopted constitutional provisions allowing for citizen initiatives and referenda. *See id.* Broadly speaking, initiatives allow the people to enact legislation directly rather than through their elected representatives. And a referendum gives the people power to repeal a law passed by the Legislature.[29] As we recounted in *Carter*,

> The thrust of the initiative movement was a
> sentiment that the people should flex the muscles of
> their organic governmental power and reserve for
> themselves the legislative power that had previously
> been vested solely in the state legislatures. Only by
> wielding the legislative power could the people

---

[29] *See* UTAH CONST. art. VI, § 1(2)(a)(i) (providing that the people may "initiate any desired legislation and cause it to be submitted to the people for adoption upon a majority vote of those voting on the legislation, as provided by statute," and that the people may "require any law passed by the Legislature, except those laws passed by a two-thirds vote of the members . . . to be submitted to the voters of the State, as provided by statute, before the law may take effect"); *see also Carter v. Lehi City*, 2012 UT 2, ¶ 30, 269 P.3d 141 ("[A] referendum or initiative cannot be characterized as a delegation of power. And in exercising the initiative [or referendum] power, the people do not act under the authority of the legislature." (cleaned up)).

govern themselves in a democracy unfettered by the distortions of representative legislatures.

*Id.* (cleaned up).

¶143  In 1898, South Dakota was the first state in the Union to adopt constitutional provisions providing its citizens with initiative and referendum power. The relevant provision in South Dakota's constitution, which has remained unchanged since its adoption, reads as follows:

> [T]he people expressly reserve to themselves the right to propose measures, which shall be submitted to a vote of the electors of the state, and also the right to require that any laws which the Legislature may have enacted shall be submitted to a vote of the electors of the state before going into effect .... This section shall not be construed so as to deprive the Legislature or any member thereof of the right to propose any measure.

S.D. CONST. art. III, § 1.

¶144  Utah was next. *See* BOWLER ET AL., *supra* ¶ 141, at 29. In 1900, Utah voters ratified an amendment to the legislative article of the Utah Constitution that extended legislative power to the people of the state. The amended provision provided, "The Legislative power of the State shall be vested in: (a) a Senate and House of Representatives which shall be designated the Legislature of the State of Utah; and (b) the people of the State of Utah as provided in Subsection (2)." UTAH CONST. art. VI, § 1(1). By dividing the legislative power in this way, the people of Utah kept the representative form of government advanced by Hamilton and Madison but also retained for themselves a greater role in governing than may have been envisioned by the more skeptical Federalists.

¶145 Subsection (2) of this provision then described the contours of the people's legislative power, providing as follows:

> The legal voters of the State of Utah, in the numbers, under the conditions, in the manner, and within the time provided by statute, may: (A) initiate any desired legislation and cause it to be submitted to the people for adoption upon a majority vote of those voting on the legislation, as provided by statute; or (B) require any law passed by the Legislature, except

those laws passed by a two-thirds vote of the members elected to each house of the Legislature, to be submitted to the voters of the State, as provided by statute, before the law may take effect.

*Id.* art. VI, § 1(2)(a)(i).

¶146  As the second state in the nation to adopt a constitutional amendment providing for citizen initiatives and referenda, Utahns had only the provision enacted by South Dakota as a domestic example, which provided that "[t]his section shall not be construed so as to deprive the Legislature or any member thereof of the right to propose any measure."[30] S.D. CONST. art. III, § 1.

¶147 But Utahns did not include similar language in our constitution. *Compare* UTAH CONST. art. VI, § 1, *with* S.D. CONST. art. III, § 1. This is significant. If the people of Utah had wanted to make explicit that the Legislature was free to override any citizen initiative, they had a prime example of how to do so.

¶148  This choice reflects not only the principles underlying the Progressive Era, but also the view of contemporary Utahns that the initiative right was intended to give the people a check on the Legislature. Beginning in 1895, people such as Theodore Brandley, once the mayor of Richfield and a member of Sevier County's delegation to Utah's 1895 constitutional convention,[31] advocated for the adoption of the initiative and referendum power into our constitution, which was still in the drafting stage at the time. Brandley stated that "[i]t is more apparent every day that a closer union between the legislative bodies and the people whom they represent should in some way be affected in order that the will of the people may be more fully respected by those whom they have chosen to serve them." Theodore Brandley, Letter to the Editor, *The Referendum*, DESERET WEEKLY, Mar. 23, 1895, at 28. On the initiative right in particular, Brandley favorably quoted a historian who had

---

[30]  South Dakota's provision has been interpreted by that state's supreme court to allow its legislature to amend or repeal legislation enacted through citizen initiatives without limitation. *See State v. Whisman*, 154 N.W. 707, 709–10 (S.D. 1915).

[31]  *See Theodore Brandley*, SALT LAKE HERALD REPUBLICAN, Apr. 30, 1895, at 3; *The Convention*, DESERET WEEKLY, Feb. 2, 1895, at 21.

studied the Swiss system,[32] stating that "[t]he right of the initiative, it must be remembered, is not only the privilege of petition enjoyed by the inhabitants of every state which makes any pretensions whatever to political liberty. *It is a constitutional demand, not an irregular request.*" *Id.*

¶149  In the lead-up to the vote on the amendment to article VI, section 1 in 1900, the prominent populist figure Henry W. Lawrence wrote in a local publication that "[d]irect legislation . . . enables the voters to deal with laws themselves, not merely with law makers. It saves the legislator from making mistakes as to the will of the people on any question." Henry W. Lawrence, *Direct Legislation*, SALT LAKE HERALD REPUBLICAN, July 1, 1900, at 12. So to Lawrence, direct legislation would "kill the lobby in legislative and city council halls, because there will be no money in making deals when the people hold the *final verdict* in their own hands." *Id.* (emphasis added). And those behind the Populist Party movement in Utah had a similar view of direct legislation, stating that the party advocated for "direct legislation—local and national—through the initiative and referendum and imperative mandate, that the will of the people may be supreme as to the laws that shall govern them." *Pops Decided to Wait*, SALT LAKE TRIB., Mar. 2, 1900, at 5.

¶150  Such sentiments were also echoed by some members of the Utah Federation of Women's Clubs.[33] At its annual conference,

---

[32]  Brandley was quoting W.D. McCracken, who authored an article titled "Swiss Solutions of American Problems." The Swiss model of the initiative and referendum powers was studied and invoked often at the time Utahns were debating the initiative and referendum provision in the Utah Constitution. *See, e.g.*, Henry W. Lawrence, *Direct Legislation*, SALT LAKE HERALD REPUBLICAN, May 20, 1900, at 12; Henry W. Lawrence, *Direct Legislation*, SALT LAKE HERALD REPUBLICAN, July 8, 1900, at 12.

[33]  Women's clubs were the result of an "American women's social movement founded in the mid-19th century to provide women an independent avenue for education and active community service." *Club Movement*, ENCYCLOPEDIA BRITANNICA, https://www.britannica.com/event/club-movement (last visited June 22, 2024). According to "[h]istorians, sociologists, and political scientists[,] . . . women's associations were remarkable sources of

(continued . . .)

Kate S. Hilliard presented a paper on the initiative and referendum power. During her presentation, Hilliard noted that, in her view, the adoption of the initiative and referendum power "was the most important subject before the people of Utah today, because it meant that by its adoption the people of the State would be rulers of the State, which they were not now." *Afternoon Session*, SALT LAKE TRIB., Oct. 28, 1900, at 11. She continued, arguing that "direct legislation would remove temptation from office-holders by placing the power in the hands of the people; that if it were adopted, the people would be the masters of the City Council and office-holders[,] instead of the reverse, as is at present true." *Id.*

¶151 Even publications opposing the 1900 amendment understood the adoption of direct legislation to be of consequence to the legislative power. In explaining the amendment, the *Deseret Evening News* noted that while "[t]he legislative branch of our system of government is entrusted with the lawmaking power," the initiative and referendum amendment would "take away the vital part of that power, and thus cause a great departure from our legislative system." *To the Voters of Utah*, DESERET EVENING NEWS, Nov. 3, 1900, at 4.

¶152 Some common themes run through these sources. First, around the time the Initiative Provision was added to the Utah Constitution, the public understood that the initiative and referendum powers would provide the people with a check on the Legislature when the people and the Legislature were not in accord on a particular issue. If their elected representatives did not enact a law that a sufficient number of people wanted, the people could do it themselves through an initiative. If the Legislature passed a law that enough people did not like, the people could undo it through a referendum. Support for the amendment was the product of a

---

popular power and public leverage in American democracy." Christine Woyshner, *Teaching the Women's Club Movement in United States History*, 93 SOC. STUD. 11, 17 (2002) (cleaned up). The Utah Federation of Women's Clubs was founded in 1893, and speakers at their "annual conventions encouraged . . . women in their intellectual endeavors" and "debated questions of women's status and rights," among other things. Suzanne M. Stauffer, *A Good Social Work: Women's Clubs, Libraries, and the Construction of a Secular Society in Utah, 1890–1920*, 46 LIBRS. & CULTURAL REC. 135, 142 (2011).

contemporary wave of distrust of elected representatives. And fundamentally, the initiative and referendum were tools that the people could use directly, especially when they were at odds in some respect with their elected representatives.

¶153 Second, at that time, people took as a given that when the people spoke through an initiative, they would have the final say on the matter at issue due to the people's inherent sovereign authority, as enshrined in article I, section 2. Such sentiment is demonstrated in statements that direct legislation would empower the people to "hold the *final verdict* in their own hands," Lawrence, *supra* ¶ 149, at 12 (emphasis added), and that "by its adoption the people of the State would be rulers of the State, which they were not now," *Afternoon Session*, *supra* ¶ 150, at 11.

¶154 This historical analysis comports with how we have discussed the initiative right in our caselaw. In *Gallivan*, although we noted that "[t]he power of the legislature and the power of the people to legislate through initiative and referenda are coequal, coextensive, and concurrent and share equal dignity," we nonetheless concluded that "[t]he reserved right and power of initiative is a fundamental right." 2002 UT 89, ¶¶ 23–24 (cleaned up). And "[b]ecause the people's right to directly legislate through initiative and referenda is sacrosanct and a fundamental right, Utah courts must defend it against encroachment and maintain it inviolate." *Id.* ¶ 27. In all, we concluded that "[b]ecause of the fundamental nature of the right of initiative and its significance to the political power of registered voters of the state, the vitality of ensuring that the right is not effectively abrogated, severely limited, or unduly burdened by the procedures enacted to enable the right and to place initiatives on the ballot is of paramount importance." *Id.*

¶155 And in *Sevier Power*, we held that the Legislature could not restrict the scope of the initiative power by statute. 2008 UT 72. In concluding that the Legislature was prohibited from restricting the topics a citizen initiative could address, we explained that "[w]ere we to accept the position . . . that . . . article VI, section 1 embraces the power [of the Legislature] to foreclose *any* subject from initiative action, we would be forced to conclude that the [L]egislature could foreclose *all* subjects just as easily from initiative action." *Id.* ¶ 10. We rejected such a notion, stating that "[t]o do so would require us to conclude that the constitutional reservation of the initiative power by the people was intended to be, and in fact

is, illusory." *Id.* "To the contrary," we determined that "we are obligated to conclude the opposite: that the reservation of the right to initiate legislation directly was *intended to be effective*." *Id.* (emphasis added).

¶156 Defendants offer no contrary historical evidence suggesting that ratification-era Utahns understood the Initiative Provision to be subject to unfettered legislative veto. At most, they point to constitutional provisions from other states that expressly limit their legislatures' ability to subsequently amend or repeal a citizen initiative, and they observe that our Initiative Provision does not include such express limitations.[34] Each of these other states' provisions, however, came after ours. *See* BOWLER ET AL., *supra* ¶ 141, at 29. So we cannot simply conclude what Defendants ask us to—that had the people of Utah intended to prevent the Legislature from changing a citizen initiative after voter approval, they would have followed the example of these other states. When Utahns added the Initiative Provision to our constitution, these examples did not exist. Further, "it will almost always be true" in questions of interpretation that the drafter "could have more clearly repudiated one party's preferred construction." *In re Estate of Hannifin*, 2013 UT 46, ¶ 25, 311 P.3d 1016. And here, just as the people of Utah could have more explicitly prevented the Legislature from amending or repealing a citizen initiative, "the converse is [also] true,"—they could have expressly endorsed the Legislature's authority to do so, like other states have done.[35] *See id.* We are left then with what the historical record tells us about the

---

[34] *See, e.g.,* ALASKA CONST. art. XI, § 6 ("An initiated law . . . may not be repealed by the Legislature within two years of its effective date. It may be amended at any time."); NEV. CONST. art. XIX, § 2(3) ("An initiative measure so approved by the voters shall not be amended, annulled, repealed, set aside or suspended by the Legislature within 3 years from the date it takes effect."); NEB. CONST. art. III, § 2 ("The Legislature shall not amend, repeal, modify, or impair a law enacted by the people by initiative . . . except upon a vote of at least two-thirds of all the members of the Legislature.").

[35] *See* S.D. CONST. art. III, § 1 ("This section shall not be construed so as to deprive the Legislature or any member thereof of the right to propose any measure."); *see also* MO. CONST. art. III, § 52(b); OR. CONST. art. IV, § 1 (1902).

"general public understanding" at the time the Initiative Provision was ratified. *Maese*, 2019 UT 58, ¶ 21 n.7. And as explained, that evidence cuts against Defendants' preferred interpretation.

3. The Alter or Reform Clause and the Initiative Provision Protect the People's Right to Reform Their Government Through a Citizen Initiative

¶157  We now draw some conclusions about the original public understanding of the scope of the two rights operating together, with the initiative power providing a means for the people to directly exercise their right to alter or reform their government. At the time of our state's founding, the people of Utah understood that they had a constitutional right to alter or reform their government within the bounds of the constitution. It was well understood that this right stemmed from the people's sovereign authority, or inherent political power, and the fact that the people founded the government "pursuant to the people's organic authority to govern themselves." *Carter*, 2012 UT 2, ¶ 21 (cleaned up). This constitutional right, however, was not the same as the natural right "to alter or to abolish" a tyrannical government that had animated the Declaration of Independence and inspired the American Revolution. Rather, this constitutional right was to be exercised in harmony with the rest of the constitution. That meant the people could exercise this right only within the bounds of the constitution itself.

¶158 Four years after statehood, the people amended the constitution to retain for themselves the power of direct legislation. The original public understanding of the right was that it would be meaningful and effective and would provide the people with their own legislative power, which was especially important in times of disagreement with the Legislature on particular issues.

¶159 In connection with article I, section 2, the Initiative Provision provided the people with a constitutional mechanism through which they could directly exercise their right to reform their government through legislation. And the historical record convinces us that the public at the time would have rejected the notion that the Legislature could effectively veto government reforms enacted through an initiative by repealing or amending them without limit.

¶160  Accordingly, we conclude that the Alter or Reform Clause and the Initiative Provision place limits on the legislative power to

amend or repeal initiatives that contain government reforms. The Alter or Reform Clause establishes a constitutional right, enumerated in the Declaration of Rights, of the people to alter or reform their government within the bounds of the constitution. And when the people alter or reform their government by passing an initiative, the exercise of these constitutional rights is protected from government infringement.

¶161 It is important to be clear about the scope of the constitutional protection afforded by these rights, and what our holding does *not* mean. As we have explained, these rights must be exercised in harmony with the rest of the constitution. Accordingly, the people cannot use an initiative to amend the Utah Constitution. *See* UTAH CONST. art. XXIII (establishing the procedures by which the Utah Constitution can be revised). Initiatives, including those that reform the government, are limited to enacting "legislation." *Id.* art. VI, § 1(2)(a)(i)(A); *see also Carter*, 2012 UT 2, ¶¶ 20–53; *Sevier Power*, 2008 UT 72, ¶ 10 ("[T]he people have reserved the right to initiate 'any desired legislation' and submit it to the voters for approval or rejection. This reservation must be read to mean . . . *any legislative act*, unless otherwise forbidden by the constitution." (cleaned up)). And an initiative cannot violate any other provision of the constitution. *Sevier Power*, 2008 UT 72, ¶ 10.

¶162 Our holding also does not give initiatives special status, as Defendants argue. The legislative power to amend or repeal government-reform initiatives is limited not because such initiatives are accorded a higher status than other statutes, but because they embody the people's exercise of constitutional rights. And because we must not render constitutional rights "illusory," *id.*, we must afford the exercise of these rights constitutional protection. We clarify, however, that this constitutional protection does not prevent the Legislature from amending a government-reform initiative. As explained above, the Legislature could amend a government-reform initiative in a way that does not infringe the people's reform right—for example, if the amendment furthered or facilitated the reform, or at least did not impair it. Further, as we will explain below, *see infra* Subsection II.A, even if the Legislature were to amend an initiative in a way that impaired the government reform, those changes would not be unconstitutional if the Legislature showed they were "narrowly tailored to protect a compelling governmental interest," *In re K.T.B.*, 2020 UT 51, ¶ 40 (cleaned up).

### D. Reinstatement of Count V

¶163 With the original public meaning of these provisions in mind, we return to the question at hand: whether the district court correctly dismissed Count V. The district court concluded that Count V did not state a violation of the constitutional rights in question because the Utah Constitution does not expressly restrict the Legislature's power to amend or repeal citizen initiatives. Having determined that there was no constitutional impediment to repealing Proposition 4, the court concluded that Plaintiffs failed to state a claim upon which relief could be granted, and it dismissed Count V.

¶164 In support of the district court's ruling, Defendants point out that the Legislature has authority to amend or repeal any statute, and a successful initiative becomes a statute. The Defendants argue that because the Initiative Provision does not explicitly say otherwise, it follows that the Legislature can amend or repeal citizen initiatives—even those that reform the government—without limitation. At oral argument, Defendants described the people's initiative and referendum power as allowing for a "ping ponging" back and forth between the people and the Legislature. *See, e.g.*, Oral Argument at 00:30:18–34, *League of Women Voters v. Utah State Legislature*, No. 20220991 (July 11, 2023), https://www.youtube.com/watch?v=NKjXEu4t38s ("Within constitutional parameters, I think it's just a function of our messy democracy . . . that the people and the Legislature might go back and forth and that they are a check on one another."); *id.* at 00:31:34–43 (articulating the "ping ponging" as follows: "So there's an initiative, there's an amendment, there's a referendum, there's a legislative enactment, there's an initiative.").

¶165 But in light of the requirements that initiative proponents must meet before an initiative is placed on the ballot, this would not be a very competitive ping-pong match. Before citizens can serve the ball and pass a government-reform initiative in the first instance, they must comply with the requirements of getting an initiative on the ballot—by obtaining "legal signatures equal to 8% of the number of active voters in the state on January 1 immediately following the last regular general election" and, "from at least 26 Utah State Senate districts, legal signatures equal to 8% of the number of active voters in that district on January 1 immediately following the last regular general election," UTAH CODE § 20A-7-201(2)(a)—and then win a majority of the popular vote in the next

election. Under Defendants' theory, the Legislature could then return the ball by repealing the government reform the next time it was in session. If the people wanted to hit the ball back by reenacting the reform, they would need to repeat the process of gathering signatures, qualifying the initiative for the ballot, and winning the vote again during the next election. But there would be no reason the second initiative would not suffer the same fate as the first one. Under Defendants' theory, the Legislature could simply repeal it again and again. And this would render illusory the right to reform the government through an initiative.

¶166  That is not to say that the people of Utah could not have constitutionalized the system Defendants describe. There is just no evidence that they did. We must interpret article I, section 2 and the Initiative Provision in accord with the original public understanding of those provisions. And the view that the legislative power provides the Legislature with an unlimited veto of government-reform initiatives is in stark contrast to the original public understanding of the right to reform the government and the initiative right. To adopt this view would require us to conclude that these constitutional reservations of power by the people "w[ere] intended to be, and in fact [are], illusory. To the contrary, we are obligated to conclude the opposite: that the reservation of [these rights] was intended to be effective." *Sevier Power*, 2008 UT 72, ¶ 10.

¶167 As to the Initiative Provision, we see nothing in the historical record before us that supports Defendants' interpretation that the provision was intended to create a potentially never-ending dialogue between the people and the Legislature. As described at length above, *supra* Subsection I.C.2, our review of the historical material convinces us that the Initiative Provision was ratified to give the people the power to legislate for themselves, especially when they were at odds with the Legislature on a particular issue.

¶168  And as to the Alter or Reform Clause, the historical record also does not support the contention that the people's proper exercise of their right to reform the government they created enjoys no constitutional protection from override by that very government.

¶169  We recognize that in analyzing Count V, the district court relied, in part, on *Carter v. Lehi City*, 2012 UT 2. In that case, we were asked to decide whether two initiatives were legislative or

administrative in nature, as "[a]n initiative is appropriate if it is legislative, but *ultra vires* if it is administrative." *Id.* ¶¶ 16–17 (cleaned up). We explained that "the question courts should ask in evaluating the propriety of a proposed initiative is whether the initiative would be a proper exercise of legislative power if enacted by the state legislature." *Id.* ¶ 20. And we explained that the "initiative power of the people is . . . parallel and coextensive with the power of the legislature." *Id.* ¶ 22. In making this point, we quoted a statement by the Oregon Supreme Court that laws enacted by initiative "may be amended or repealed by the Legislature at will." *Id.* ¶ 27 (quoting *Kadderly v. City of Portland*, 74 P. 710, 720 (Or. 1903)). We understand why the district court relied on what we quoted in *Carter*, particularly given the lack of our own caselaw on this point. The district court was presented with a constitutional question of first impression on which there was no direct Utah precedent.

¶170  But our quotation of the Oregon Supreme Court in *Carter* was dicta. As explained, the issue in *Carter* was whether the subject matter of two initiatives was legislative in nature. The question of whether the Legislature could repeal a citizen initiative was not before us. Accordingly, our quotation of the Oregon Supreme Court on that point was not necessary to our holding in that case, and we repudiate it. *See State v. Hummel*, 2017 UT 19, ¶ 38, 393 P.3d 314 (distinguishing between holdings and dicta for purposes of stare decisis). Further, our explanation that the "initiative power of the people is . . . parallel and coextensive with the power of the legislature," *Carter*, 2012 UT 2, ¶ 22, must be viewed in the context of the issue before us in that case. In analyzing the appropriate subject matter of an initiative, it is correct that if an "initiative would be a proper exercise of legislative power if enacted by the state legislature," then it is also a proper exercise of legislative power by the people. *Id.* ¶ 20. But that does not answer the question before us here.

¶171  Having now been squarely presented with the issue of the Legislature's authority to amend or repeal a citizen initiative, we cannot conclude that the Legislature has unlimited authority to amend or repeal citizen initiatives that alter or reform the government. Such a conclusion would contravene the original public understanding of these important rights. Accordingly, this does not provide a basis to dismiss Count V as a matter of law.

¶172 We now address three additional grounds for affirmance advanced by Defendants. They argue, for various reasons, that article I, section 2 does not establish a constitutional right that is protected from government infringement and enforceable in court. We explain why we disagree with each ground in turn.

### E. Defendants' Alternative Grounds for Affirmance

¶173 Defendants have advanced several alternative grounds to affirm, which focus on the justiciability of a claim arising under article I, section 2. "[I]t is well established that an appellate court may affirm the judgment appealed from if it is sustainable on any legal ground or theory apparent on the record, even if it differs from that stated by the trial court." *Am. W. Bank Members, L.C. v. State*, 2014 UT 49, ¶ 7, 342 P.3d 224 (cleaned up).

¶174 Defendants first argue that article I, section 2 does not provide a basis for a judicially enforceable claim at all, because this provision is not self-executing. They then argue that Plaintiffs' claims under the Initiative Provision and Alter or Reform Clause are not justiciable. And finally, Defendants posit that when the Legislature enacted S.B. 200, it was essentially the people exercising their right to alter or reform their government through their representatives. Consequently, they assert that the Legislature was acting in accord with, rather than violating, article I, section 2 when it repealed Proposition 4. We conclude that none of these arguments provide an alternative ground to dismiss Count V as a matter of law.

#### 1. Defendants' Argument that Article I, Section 2 Is Not Self-Executing Does Not Provide an Alternative Ground for Affirmance

¶175 Defendants argue that "Plaintiffs' reliance on Article I, [section] 2 is misplaced" because it is not self-executing and is therefore unenforceable. We disagree.

¶176 We have explained that a constitutional provision is not self-executing where it "furnishes no rule for its own enforcement, or where it expressly or impliedly requires legislative action to give effect to the purposes contemplated." *Mercur Gold Mining & Milling Co. v. Spry*, 52 P. 382, 384 (Utah 1898) (cleaned up). On the other hand, a constitutional provision is self-executing if the right it sets out is both "judicially definable and enforceable absent enabling legislation." *See Spackman ex rel. Spackman v. Bd. of Educ.*, 2000 UT 87, ¶ 16, 16 P.3d 533. And like other questions of

constitutional interpretation, we judge this based "in large part" on the original public meaning of the provision at issue. *See Zimmerman v. Univ. of Utah*, 2018 UT 1, ¶ 18, 417 P.3d 78.

¶177 Defendants contend that article I, section 2 is not self-executing because it (1) "states a high-level premise of the government" that is too general for courts to apply, and (2) "does not provide the means of its own enforcement." We address these arguments in turn. But as an initial matter, we note that Defendants' arguments seem to focus on the first two clauses of article I, section 2, and they frame the issue as whether article I, section 2 is self-executing, taken as a whole.

¶178 However, the constitutional violation Plaintiffs allege in Count V is specific to the Alter or Reform Clause (along with the Initiative Provision). Certainly, the first two clauses of article I, section 2 are relevant to the analysis of Plaintiffs' claim. Plaintiffs mention the first two clauses in their analysis, for example, when they observe that "Prop 4's proponents explicitly invoked the people's rights to secure their popular sovereignty and to reform their government when they presented the initiative to the voters." And we have explained that the first two clauses bear upon the meaning of the Alter or Reform Clause. *See supra* ¶¶ 105–07. But although these clauses may be relevant here, we do not understand Count V to assert that S.B. 200 violated the people's inherent political power, or the mandate that "all free governments are founded on [the people's] authority." Nor do Plaintiffs seek a remedy under either of these clauses. Accordingly, we confine our analysis to the question of whether the Alter or Reform Clause is self-executing. *See, e.g.*, *Tesla Motors UT, Inc. v. Utah Tax Comm'n*, 2017 UT 18, ¶¶ 51–54, 398 P.3d 55 (assessing only whether the Free Market Clause of article XII, section 20 is self-executing); *Zimmerman*, 2018 UT 1, ¶ 17 (framing the issue as whether the Free Speech Clause in article I, section 15 is self-executing, without respect to other parts of section 15 regarding free press and criminal libel).

¶179 And while the other clauses of article I, section 2 certainly inform the original public meaning of the Alter or Reform Clause, when it comes to the self-execution doctrine, we think the Alter or Reform Clause speaks for itself. Put another way, to the extent the Alter or Reform Clause sets out a clearly defined rule, we decline to ignore that mandate, regardless of whether the first two clauses

do or do not. (And needless to say, we express no opinion as to whether the first two clauses are self-executing.)

¶180 With that clarification, we conclude that Defendants' first argument is a non-starter. They argue that article I, section 2—again, taken as a whole—simply "restates the 'basic premise[] upon which all our government is built'" and that "[s]uch a general statement of principle is not sufficient to be self-executing." (Quoting *Carter*, 2012 UT 2, ¶ 21.) But the question here is whether the Alter or Reform Clause "furnishes [a] rule for its own enforcement." *Mercur Gold*, 52 P. at 384 (cleaned up). And Defendants do not engage with the text of the Alter or Reform Clause to explain how it is "stated at so high a level of generality or aspiration" that it lacks a justiciable standard. *Tesla Motors*, 2017 UT 18, ¶ 52.

¶181 Looking at it for ourselves, we conclude that the Alter or Reform Clause is not so general or aspirational to be unenforceable. While we have not identified how much "generality" is too much, our cases provide a good measuring stick. We held in *Tesla Motors*, for instance, that the Free Market Clause is "too vague . . . to sustain a justiciable constitutional standard" because it merely states that our "state government is in favor of a 'free market'"—and not much else. *Id.* ¶¶ 53–54; *see* Utah Const. art. XII, § 20 ("It is the policy of the state of Utah that a free market system shall govern trade and commerce in this state to promote the dispersion of economic and political power and the general welfare of all the people."). But we have also held that several other constitutional provisions do articulate a sufficiently definable rule, including ones with difficult to pin down phrases like "due process,"[36] "cruel and unusual punishments,"[37] and "unreasonable searches and seizures."[38] These phrases are certainly "general" in the sense that entire textbooks could be dedicated to explaining them. And yet we have never shied away from interpreting them. So when deciding whether a constitutional provision articulates a judicially definable

---

[36] *Spackman ex rel. Spackman v. Bd. of Educ.*, 2000 UT 87, ¶¶ 10–13, 16 P.3d 533.

[37] *Bott v. DeLand*, 922 P.2d 732, 737–38 (Utah 1996), *abrogated on other grounds by Spackman*, 2000 UT 87, ¶ 20 n.5.

[38] *Jensen ex rel. Jensen v. Cunningham*, 2011 UT 17, ¶¶ 63–64, 250 P.3d 465.

rule, the question simply cannot be whether the rule is difficult to apply or whether we might wish for a clearer one. We look instead for whether the provision sets out a rule at all; if it does, we do our best to apply it.

¶182 The Alter or Reform Clause states a judicially definable rule. It provides that the people "have the right to alter or reform their government as the public welfare may require." UTAH CONST. art. I, § 2. Unlike the Free Market Clause in *Tesla Motors*, the Alter or Reform Clause does more than simply articulate a policy or aspiration. Rather, like many other constitutional provisions, it plainly identifies a right—one that we presume, and know from historical context, *see supra* ¶¶ 120–36, that ratification-era Utahns understood they had reserved for themselves as they allocated power to their representatives in the government they had formed. And although the text does not explicitly detail what it means to "alter or reform [the] government," courts are well-equipped to determine the original public meaning of these terms and how the principles they embody apply to a given set of facts today. Accordingly, the Alter or Reform Clause is not too general to be judicially enforced.

¶183 Defendants next argue that article I, section 2 is not self-executing because it "does not supply the means of its own enforcement." This argument suggests that this provision "requires legislative action to give effect to the purposes contemplated." *Mercur Gold*, 52 P. at 384 (cleaned up). Again, Defendants' analysis does not address the Alter or Reform Clause specifically.

¶184 Sometimes a constitutional provision is not self-executing because it expressly leaves it to the Legislature to implement the means of enforcing it. For instance, we have held that article XVI, section 7 of our constitution "is not self-executing" because it "states that 'the Legislature . . . shall provide for the enforcement of the provisions of this article.'" *Harvey v. Ute Indian Tribe of Uintah & Ouray Rsrv.*, 2017 UT 75, ¶ 77, 416 P.3d 401 (cleaned up) (quoting UTAH CONST. art. XVI, § 7). And we have also stated that a constitutional provision is not self-executing if it "impliedly requires legislative action," even if the text does not expressly call for it. *Mercur Gold*, 52 P. at 384 (cleaned up) (analyzing article XIII, section 4 of the Utah Constitution, regarding the taxation of the proceeds of mines and mining claims). This undoubtedly "turns . . . on an originalist inquiry" and whether we can say that Utahns at the time of ratification would have understood that the provision

"requir[ed] a legislative act to put it into effect." *Zimmerman*, 2018 UT 1, ¶ 18 (cleaned up).

¶185 We note that the Alter or Reform Clause appears in our constitution's Declaration of Rights—where we find "those rights felt by the drafters of the document to be of such importance that they be separately described." *Sevier Power*, 2008 UT 72, ¶ 5. As Justice Stewart explained, this is especially so because, at the time of enactment, "none of the specific provisions in the federal Bill of Rights [were] deemed binding on the states." *State v. Anderson*, 910 P.2d 1229, 1240 (Utah 1996) (Stewart, J., concurring). Utahns therefore "viewed their own state constitutional provisions as the sole source of constitutional protection" against the state government, and they "necessarily intended that this Court should be . . . the ultimate and final arbiter of the meaning of the provisions in the Utah Declaration of Rights." *Id.*

¶186 So as a general matter, we are loath to say that a provision in our Declaration of Rights, which functions as a set of restraints on government action, depends on the government to be enforceable, unless explicitly indicated.[39] As we stated in *Berry*,

---

[39] We are unaware of any case where we have held that a provision in our Declaration of Rights is not self-executing for lack of enabling legislation. In *Spackman*, we said in a footnote that we had previously concluded that article I, section 17 was not self-executing. *See* 2000 UT 87, ¶ 9 n.3. But we cited *Anderson v. Cook*, 130 P.2d 278 (Utah 1942) (per curiam), for that proposition, and it is unclear whether *Anderson* said this. *Anderson* involved a statute that segregated primary votes a candidate received from their own party from any write-in votes the candidate happened to receive in other parties' primaries. *See id.* at 285. We rejected a candidate's argument that the statute violated article I, section 17: "All elections shall be free, and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage." *Id.* (quoting UTAH CONST. art. I, § 17). Along the way, we stated that article I, section 17 was not "self-executing" in the sense that the Legislature was free "to provide by law for the conduct of elections, and the means of voting, and the methods of selecting nominees." *Id.* And because the statute was part of that "machinery," we concluded that it did not violate article I, section 17. *Id.* Although we used the term "self-executing," it appears we meant only that

(continued . . .)

with respect to the Open Courts Clause, "The very assertion that section 11 is only a 'philosophical statement' is necessarily inconsistent with the premise of a written constitution which was intended to be, and is, a statement of positive law that limits the powers of government." 717 P.2d at 676. Focusing on article I, section 26, we explained that this provision "rivets" all "rights in the Declaration of Rights[] into the fundamental law of the State and makes them enforceable in a court of law." *Id.*

¶187 We need not decide whether the Alter or Reform Clause is a rare exception to this general rule, however, because the Initiative Provision clearly provides the people with a direct method of exercising their right to reform the government. And that is what Plaintiffs allege happened in this case. Accordingly, we reject the argument that the Alter or Reform Clause is ineffective without further action by the Legislature.

¶188 In sum, Defendants' contention that article I, section 2 is not self-executing does not provide an alternative basis to affirm the dismissal of Count V.

2. The Constitutional Claim Alleged Here Is Justiciable

¶189 Defendants next argue that claims under article I, section 2 are not justiciable. They posit that the United States Supreme Court "has long held that cases involving competing claims of legitimate governmental acts are non-justiciable." On this basis, Defendants argue that courts "lack[] judicial tools to assess whether an act of the legislature (like S.B. 200) or an initiative (like Proposition 4) reflects the true will of the people." But a review of the authority cited dispels the breadth of this proposition. Defendants cite *Luther v. Borden*, 48 U.S. (7 How.) 1, 12 L. Ed. 581 (1849), and *Pacific States Telephone & Telegraph Co. v. Oregon*, 223 U.S. 118 (1912). Both cases involved the following provision of

---

article I, section 17 did not answer every question of elections law. That is different from what the self-execution doctrine asks; we did not conclude in *Anderson* that article I, section 17 set out a nonjusticiable standard or that it required implementing legislation to have any legal effect. To the contrary, we explained that it "guarantees the qualified elector the free exercise of his right of suffrage"—which we probably would not have said if, in the same breath, we had concluded article I, section 17 was not self-executing. *Id.*

the U.S. Constitution: "The United States shall guarantee to every State in this Union a Republican Form of Government." U.S. CONST. art. IV, § 4. And both cases dealt with determining which government or form of government in a state was legitimate. The Court determined in both cases that such an issue was not justiciable, as it would require the judiciary to pick and choose between competing governments or create one government after undoing another. *See Luther*, 48 U.S. (7 How.) at 42; *Pac. States Tel. & Tel. Co.*, 223 U.S. at 149–51. So rather than dealing with competing "legitimate governmental acts," these cases only addressed who should decide, under the United States Constitution, which *government* or *form of government* is legitimate. This is a fundamentally different question than the one we face here.

¶190 Further, the question before us is not whether Proposition 4 or S.B. 200 "reflects the true will of the people." All we must decide is whether Plaintiffs' claim that Defendants violated the people's right to alter or reform the government through a citizen initiative is a legally cognizable claim on which relief can be granted. This is a question courts are capable of answering through traditional tools of constitutional interpretation.

### 3. Senate Bill 200 Was Not an Exercise of the People's Right to Alter or Reform the Government

¶191  Lastly, Defendants argue that the repeal of Proposition 4 did not violate the Alter or Reform Clause in article I, section 2 because that provision "permits the people, *acting through the Legislature*, to alter the government 'as the public welfare may require.'" (Emphasis added.) (Quoting UTAH CONST. art. I, § 2.) So, Defendants reason, "if Proposition 4 were an exercise of the people's [a]rticle I, [section] 2 power, then so was S.B. 200. Acts of the Legislature, just as much as popular initiatives, exercise the people's power delegated via the Constitution." Defendants argue that the Legislature was reforming the government, on behalf of the people, by correcting perceived flaws in Proposition 4.

¶192 We agree with Defendants that one way in which the people could choose to exercise their right to alter or reform the government is to petition their representatives to enact legislation or propose a constitutional amendment or convention. But the right itself should not be confused with the means through which the people choose to exercise it. The "right to alter or reform the government" as articulated in the third clause of article I, section 2

belongs to the people. To be sure, through the Utah Constitution, the people of Utah established a republican form of government in which they "divided their political power, vesting it in the various branches of government." *Carter*, 2012 UT 2, ¶ 22. But as discussed, the first two clauses of article I, section 2 reference the relationship between the people and their government and reinforce that "[a]ll political power is inherent in the people; and all free governments are founded on their authority." UTAH CONST. art. I, § 2. And as we have discussed in depth, in the final clause of article I, section 2, the people retained for themselves more direct control over the government they had created. *See supra* ¶¶ 105–134. The "right to alter or reform the government" refers to a right retained by the people themselves to correct the government they created.

¶193 While the people could choose to exercise their reform right through their representatives, the Initiative Provision gives the people the power to enact statutory reform directly. *See supra* Subsection I.C.2. It would negate the people's retained right to reform their government directly, and would misunderstand the scope of the Alter or Reform Clause, if we were to hold that by repealing a citizen reform initiative, the Legislature was simply exercising the same right to reform the government that the people had retained for themselves.

4. Defendants Suggest that Parts of Proposition 4 Were Unconstitutional, but They Have Not Raised Such Arguments for Our Determination or Briefed Them

¶194 We note that as part of their argument that S.B. 200 was an exercise of the people's reform right, Defendants assert that the Legislature repealed Proposition 4, in part, because it viewed some of its provisions as unconstitutional. But Defendants have not asked us to decide the constitutionality of any such provisions, nor have they briefed these issues for our review. Merely asserting that some of Proposition 4's provisions were unconstitutional is not sufficient. Accordingly, we can make no conclusions today as to whether the Legislature was correct in its assessments. *See ASC Utah, Inc. v. Wolf Mountain Resorts, L.C.*, 2013 UT 24, ¶ 16, 309 P.3d 201.

¶195 We note that the Governor expressed concerns in his amicus brief that parts of Proposition 4 were unconstitutional. As stated, we cannot decide these issues, as they have not been raised by either party. But we make a few observations in an effort to address the Governor's contentions.

¶196 One of the Governor's primary concerns is that Proposition 4 violated article IX, section 1 of the Utah Constitution by impermissibly intruding on the Legislature's redistricting power and providing the Independent Commission with more than an advisory role in the process. Article IX, section 1 states:

> No later than the annual general session next following the Legislature's receipt of the results of an enumeration made by the authority of the United States, the Legislature shall divide the state into congressional, legislative, and other districts accordingly.

UTAH CONST. art. IX, § 1.

¶197 In considering this point, it is important to bear in mind what Proposition 4 did and did not do. It did not take the authority to enact electoral maps from the Legislature and give it to the Independent Commission. Rather, it empowered the Independent Commission to create proposed maps, which the Legislature was required to consider. *See* UTAH CODE § 20A-19-204(2)(a) (2018) ("The Legislature shall *either* enact without change or amendment . . . *or* reject the Commission's recommended redistricting plans submitted to the Legislature . . . ." (emphasis added)). Accordingly, under Proposition 4, the Legislature could reject the Independent Commission's proposed maps. *Id.* However, if the Legislature rejected the proposed maps and used its own, the Legislature's maps, like the Commission's, would have to comply with the initiative's prohibition on partisan gerrymandering and its neutral redistricting criteria. *Id.* § 20A-19-103(1) (2018) ("[E]stablish[ing] redistricting standards and requirements *applicable to the Legislature* and to the Utah Independent Redistricting Commission." (emphasis added)). And the Legislature would have had to explain why its maps met these criteria better than the maps proposed by the Independent Commission. *Id.* § 20A-19-204(5)(a) (2018) (stating that if the Legislature rejected the Commission's map and adopted its own, "the Legislature shall issue to the public a detailed written report setting forth the reasons for rejecting the plan or plans submitted to the Legislature . . . and a detailed explanation of why the redistricting plan enacted by the Legislature better satisfies the redistricting standards and requirements contained in this chapter").

¶198 Accordingly, under Proposition 4, the Legislature retained the ultimate responsibility for "divid[ing] the state into

congressional, legislative, and other districts." *See* UTAH CONST. art. IX, § 1. So, to establish that Proposition 4 violated the Utah Constitution, a party would have to show that article IX, section 1 does more than grant the Legislature authority to enact legislation setting congressional boundaries. They would have to show that the provision prohibits the people from using their own legislative power to, for example, enact statutory standards for the redistricting process, or establish an independent commission to create proposed maps that the Legislature is required to consider.

\* \* \*

¶199  In sum, the original public meaning of article I, section 2—especially the Alter or Reform Clause—and of the Initiative Provision demonstrates that the people's exercise of their right to reform the government through an initiative is constitutionally protected from government infringement, including legislative amendment or repeal that impairs the intended reform. Accordingly, the general legislative power to amend and repeal statutes is not a basis to dismiss Count V. Further, we are not persuaded by the additional grounds for affirmance advanced by Defendants. For these reasons, we reverse the dismissal of Count V.

II. INSTRUCTIONS ON REMAND

¶200  With Count V reinstated, we remand this case back to the district court for further proceedings consistent with this opinion. We end with guidance on two points. First, to assist the parties and the district court as the litigation of this claim proceeds, we complete our discussion of the legal standards applicable to Plaintiffs' Count V claim. We do not intend to suggest what should transpire next in the district court. We leave that to the court and the parties. We provide the legal framework for Count V only to provide guidance when it is ultimately adjudicated, whether that be through a dispositive motion or at trial. Second, we address Defendants' appeal of the district court's denial of its motion to dismiss Counts I through IV of the Complaint.

*A. The Legal Standard Applicable to Count V*

¶201 We have discussed above the elements Plaintiffs will ultimately need to prove to make out their Count V claim in the district court. *See supra* ¶¶ 71–74.

¶202  If Plaintiffs make this showing, then the burden will shift to Defendants, who will have an opportunity to establish that S.B. 200 is not unconstitutional because it satisfies strict scrutiny.

Specifically, they would need to show that S.B. 200—which repealed and replaced Proposition 4—is narrowly tailored to advance a compelling government interest. *In re Adoption of K.T.B.*, 2020 UT 51, ¶ 40, 472 P.3d 843.

¶203 "Whether a statute improperly allows the state to extinguish or foreclose a protected right depends on the nature of the right and its attendant standard of review." *Id.* ¶ 32. Generally, if the right at issue is "a right we have deemed fundamental, we review the statute under our strict scrutiny standard. But if it is not fundamental, we review it under the deferential, fallback standard of rationality or arbitrariness." *Id.* (cleaned up). Thus, we determine the applicable standard of scrutiny by looking to the "nature of the right[s]" at issue. *Id.*

¶204 Two rights are at issue here: the initiative right, found in the Initiative Provision of article VI, section 1; and the right to reform the government, found in the Alter or Reform Clause of article I, section 2.

¶205 With respect to the initiative right, we have most often discussed the nature of the right and its attendant standard of scrutiny in cases involving statutes that regulate the procedures for qualifying an initiative for the ballot. *See, e.g.*, *Gallivan v. Walker*, 2002 UT 89, ¶¶ 30–83, 54 P.3d 1069 (multi-county signature requirement); *Utah Safe to Learn-Safe to Worship Coal., Inc. v. State*, 2004 UT 32, ¶¶ 23–37, 94 P.3d 217 (senate district requirement, signature removal provision, and one-year requirement); *Count My Vote, Inc. v. Cox*, 2019 UT 60, ¶¶ 24–77, 452 P.3d 1109 (removal provision and senate district requirement). In these cases, we have made clear that, "[b]ecause the people's right to directly legislate through initiative . . . is sacrosanct and a fundamental right, Utah courts must defend it against encroachment and maintain it inviolate." *Gallivan*, 2002 UT 89, ¶ 27; *see also id.* ¶ 24 ("The reserved right and power of initiative is a fundamental right under article VI, section 1 of the Utah Constitution."). For that reason, and because of "its significance to the political power of registered voters of the state," we have concluded that courts must ensure that the initiative right "is not effectively abrogated, severely limited, or unduly burdened." *Id.* ¶ 27.

¶206 At the same time, we have recognized that the Initiative Provision itself directs that the "conditions," "manner," and "time" for placing an initiative on the ballot are to be set by statute. UTAH CONST. art. VI, § 1(2)(a)(i). We review challenges to the

Legislature's exercise of that authority under a standard that falls below strict scrutiny, but is more exacting than rational basis review. *See Safe to Learn*, 2004 UT 32, ¶ 37. To determine whether a statute regulating the condition, manner, and time to qualify an initiative for the ballot unduly burdens the initiative right, courts assess "whether the [statute] is reasonable, whether it has a legitimate legislative purpose, and whether the [statute] reasonably tends to further that legislative purpose." *Id.* ¶ 35.

¶207  But where an initiative-regulating statute is challenged as violating a right other than the initiative right, we have analyzed that claim under its own attendant standard of scrutiny—untempered by our consideration of the Legislature's authority to regulate the initiative process. In *Gallivan v. Walker*, the plaintiffs claimed that the initiative regulations at issue violated the Uniform Operation of Laws Provision in article I, section 24—which proscribes classifications that have a disparate impact on similarly situated persons—because the statute disfavored Utahns living in urban counties and favored Utahns living in less populous, rural counties. *See* 2002 UT 89, ¶ 34. We determined that the challenged statute created a classification that "impact[ed] the right of the people to exercise their reserved legislative power and their right to vote," which "are fundamental and critical rights to which the Utah Constitution has accorded special sanctity." *Id.* ¶ 41. Accordingly, because the law created a classification that implicated fundamental rights, "we review[ed] the challenged law with heightened scrutiny."[40] *Id.* ¶ 42.

¶208 We have not had occasion to analyze the standard of scrutiny applicable to an alleged violation of the Alter or Reform Clause. But our analysis of the right to reform the government makes clear that it is a fundamental right, held by the people of this state, and guaranteed by the Utah Constitution. It is specifically enumerated in our constitution's Declaration of Rights. *See* UTAH

---

[40]  In doing so, we explained that "[A] statutory classification that discriminates against a person's constitutionally protected [fundamental or critical] right is constitutional only if it (1) is reasonable, (2) has more than a speculative tendency to further the legislative objective and, in fact, actually and substantially furthers a valid legislative purpose, and (3) is reasonably necessary to further a legitimate legislative goal." *Gallivan v. Walker*, 2002 UT 89, ¶ 42, 54 P.3d 1069 (cleaned up).

Const. art. I, § 2. And as we have explained, "Article I of our constitution is a declaration of those rights felt by the drafters of the document to be of such importance that they be separately described." *Sevier Power Co. v. Bd. of Sevier Cnty. Comm'rs*, 2008 UT 72, ¶ 5, 196 P.3d 583. Further, as with other fundamental rights, it "form[s] an implicit part of the life of a free citizen in a free society," *Tindley v. Salt Lake City Sch. Dist.*, 2005 UT 30, ¶ 29, 116 P.3d 295 (cleaned up), corresponding as it does to the foundational principle of popular sovereignty, which is the "very essence" of our republican form of government, *The Constitutional Convention: The Body Organizes and Begins Work*, Deseret News, July 6, 1887, at 4.

¶209  The appropriate standard of scrutiny for Plaintiffs' claim that S.B. 200 violates the people's right to reform their government through a citizen initiative is strict scrutiny.[41] We have held that statutes infringing fundamental rights are subject to this level of review. *See, e.g.*, *In re K.T.B.*, 2020 UT 51, ¶ 32; *Jones v. Jones*, 2015 UT 84, ¶ 26, 359 P.3d 603; *Jensen ex rel. Jensen v. Cunningham*, 2011 UT 17, ¶ 72, 250 P.3d 465 (recognizing that "a parent has a due process right . . . to maintain parental ties to his or her child" and that "[a] statute that infringes upon this 'fundamental' right . . . is unconstitutional unless it (1) furthers a compelling state interest and (2) "the means adopted are narrowly tailored to achieve the basic statutory purpose." (cleaned up)). And as we have explained, the rights at issue in this case are unquestionably fundamental. When Utahns use their initiative power to exercise their right to reform their government, they are engaging in a constitutionally preserved avenue for *direct* government reform. As we have explained, the reform right must be exercised within the bounds of the Utah Constitution as a whole. And other methods of reforming the government require the people to work through their elected representatives. To reform the government through a constitutional amendment, the people must follow the constitutional amendment process, which begins in the Legislature. *See* Utah Const. art. XXIII, § 2. Another way to accomplish statutory government reform would be to petition the Legislature to pass legislation containing the citizen's desired reforms. But

---

[41]  Plaintiffs also claim that S.B. 200 violated the initiative right, standing alone. However, as we have discussed, we do not resolve that claim. And we do not opine on its attendant standard of scrutiny.

through their initiative power, the people can bring about statutory government reform directly. If government-reform initiatives are subject to legislative veto, then the Alter or Reform Clause is severely diminished because the people will have no way to reform their government without the government's agreement and participation. The constitution requires that this avenue remain open. Accordingly, legislation that impairs government reform enacted through an initiative must be subject to strict scrutiny. If Plaintiffs are able to make out the claim elements we have established, the burden will shift to Defendants to show that S.B. 200 is narrowly tailored to advance a compelling state interest. *See In re K.T.B.*, 2020 UT 51, ¶ 40; *Utah Pub. Emps. Ass'n v. State*, 610 P.2d 1272, 1273 (Utah 1980) ("Under [strict scrutiny], the state must bear the . . . burden of establishing the existence of a compelling state interest which justifies [infringement of the right at issue]."); *cf. Safe to Learn*, 2004 UT 32, ¶ 24 ("Under [*Gallivan*'s heightened scrutiny] standard, the burden of proof shifts to the State to show that a challenged provision actually and substantially furthers a valid legislative purpose and is reasonably necessary to further a legitimate legislative goal." (cleaned up)).

¶210 Defendants argue against this standard, and they further assert that we should not apply any standard of scrutiny to this claim. Focusing on article I, section 2 in particular, they argue that we are presented with a "structural question" that we should resolve by looking only to the text, structure, and history of article VI—the legislative article—and that we should uphold S.B. 200 as long as it was a proper exercise of legislative power. The premise of their argument is that article I, section 2, as a whole, is a "structural provision." They refer to our statement in *Carter v. Lehi* that, in line with the basic premise of article I, section 2 that "'[a]ll political power is inherent in the people; and all free governments are founded on their authority,'" the people "allocate[d] governmental power in the bodies they establish[ed]" when they ratified the Utah Constitution. 2012 UT 2, ¶ 21, 269 P.3d 141 (quoting UTAH CONST. art. I, § 2). From this, they reason that "[w]hat follows in the rest of the Constitution are manifestations of the people's sovereign authority to alter or reform their government." So, Defendants contend, as long as "the constitutionally ordained allocation of power has been maintained," then article I, section 2 is not offended.

¶211 With respect to the Legislature in particular, Defendants argue that if the Legislature acts within the bounds of the legislative

power granted to it by the people in article VI—for example, by enacting laws that are properly legislative, avoiding bills containing more than one subject, *see* UTAH CONST. art. VI, § 22; passing only general laws, *id.* art. VI, § 26; and not "author[izing] any game of chance," *id.* art. VI, § 27, then there can be no violation of article I, section 2. Thus, they argue that the constitutional question presented here is purely a structural one, which should be answered based solely on whether the enactment of S.B. 200 was "a proper exercise of legislative power" under article VI. They contend that "Article I, [section] 2 is vindicated when the Legislature . . . abide[s] by the Article VI structure the people first created (or amended), nothing more and nothing less."

¶212 But Defendants' characterization of article I, section 2 as solely a structural provision, which is fully satisfied by government entities' observation of the separation of powers, reads the Alter or Reform Clause out of the provision. Their characterization focuses only on the first two clauses of the section. We agree that the first two clauses express the foundational idea of popular sovereignty, that free governments must be founded on the authority of the people. *See Carter*, 2012 UT 2, ¶ 21. And we agree that the constitution itself is a manifestation of the people's authority to "allocate governmental power in the bodies they establish." *Id.* But Defendants' argument that this is the sum and substance of article I, section 2 gives no independent meaning to the Alter or Reform Clause.

¶213 As we have explained, the Alter or Reform Clause is not superfluous; it has its own meaning and import. *See supra* Subsections I.C.1., I.E.1. It is not about the power to form a government in the first instance. It is about the people's reserved right to make corrections to the government they created, when necessary for the public welfare.

¶214 Thus, whether S.B. 200 violates the people's right to reform the government through an initiative is not a structural question. Plaintiffs do not claim that S.B. 200 is not properly legislative, or that it otherwise violates Article VI, or that the Legislature has somehow violated the separation of powers laid out in the constitution. They argue that the Alter or Reform Clause establishes an enforceable right in the people that can be exercised through the Initiative Provision, and that S.B. 200 violates this right because it nullified the government reform contained in Proposition 4. That question cannot be answered by simply looking

at the text of article VI and determining whether S.B. 200 was properly legislative. That is not how we analyze claims that legislation violates a constitutional right. *See In re K.T.B.*, 2020 UT 51, ¶ 32.

¶215 Defendants misread our precedent when they argue that we *do* analyze such claims in this manner, without resort to standards of scrutiny. Importantly, in the cases on which Defendants rely, we did not analyze claims that legislation violated a constitutional right. *See Carter*, 2012 UT 2, ¶ 16 (analyzing whether two proposed initiatives were properly legislative or administrative in nature); *Grant v. Herbert*, 2019 UT 42, ¶¶ 19, 21–34, 449 P.3d 122 (analyzing only (1) whether the governor exceeded his authority by convening a special legislative session, and (2) whether the lieutenant governor improperly denied an application for referendum).

¶216 Certainly, when we interpret the scope of a constitutional right, we analyze the text, structure, and original public meaning of the right in question—just as we have done in this case. *See South Salt Lake City v. Maese*, 2019 UT 58, ¶¶ 18–19, 450 P.3d 1092 ("In interpreting the Utah Constitution, . . . [we] analyze its text, historical evidence of the state of the law when it was drafted, and Utah's particular traditions at the time of drafting." (cleaned up)); *see also Neese v. Utah Bd. of Pardons & Parole*, 2017 UT 89, ¶¶ 96–100, 416 P.3d 663 (explaining how we "ascertain the original public meaning of the constitutional text"). But contrary to Defendants' suggestion, our analysis does not end there. Once we have determined the scope of a right, and that legislation infringes it, we then apply the attendant standard of scrutiny to determine whether the statute in question must be deemed unconstitutional. *See, e.g., In re K.T.B.*, 2020 UT 51, ¶¶ 32, 40–50; *Count My Vote*, 2019 UT 60, ¶¶ 29–31; *Jensen*, 2011 UT 17, ¶ 72; *Safe to Learn*, 2004 UT 32, ¶ 31; *Gallivan*, 2002 UT 89, ¶¶ 39–40; *Lee v. Gaufin*, 867 P.2d 572, 580–83 (Utah 1993).

¶217 Defendants argue that we should not take that step. They assert that we should eschew levels of scrutiny in our constitutional analysis altogether. In their view, we should determine the scope of the right in question based on its text, structure, and history. And if legislation infringes that right, we should deem it unconstitutional—without regard for the importance of the government interest it advances or the precision with which it does so. This is a surprising argument from the Legislature, because a

primary reason for employing levels of scrutiny is to avoid tying the Legislature's hands while still protecting fundamental rights. Thus, we have not followed the absolutist approach for which Defendants advocate.

¶218 We will continue to carry out our "duty to evaluate the constitutionality of legislative acts," *Moore v. Harper*, 600 U.S. 1, 19 (2023), to ensure that constitutional provisions espousing fundamental rights are not unduly infringed by legislation. In doing so, we will follow decades of precedent in which we have employed levels of scrutiny, with the appropriate level dependent on the nature of the right in question. Where the people's right to directly reform the government through their initiative power is at issue, strict scrutiny is required.

¶219 Accordingly, if Plaintiffs are ultimately able to establish the elements of their claim in the district court, the burden will shift to Defendants to show that S.B. 200 was narrowly tailored to advance a compelling government interest. *See In re K.T.B.*, 2020 UT 51, ¶ 40. If they cannot do so, S.B. 200 must be deemed unconstitutional.

### B. Counts I Through IV

¶220 Defendants appeal the district court's denial of their motion to dismiss Counts I through IV. We decline to reach these issues, but we retain jurisdiction over Defendants' appeal pending resolution of Count V. We will resolve the appeal if the resolution of Count V in the district court does not render it moot.

¶221 We do this for several reasons. We note, as an initial matter, that this case comes to us on interlocutory appeal. *See* UTAH R. APP. P. 5. So our authority to reach the issues presently before us is discretionary. *See Salt Lake Trib. v. State Recs. Comm.*, 2019 UT 68, ¶ 11, 456 P.3d 728 ("[Interlocutory appeal] is not an appeal as a matter of right." (cleaned up)). Further, while the purpose of interlocutory review "is to get directly at and dispose of the issues as quickly as possible," where the issues raised "may become moot" or otherwise "abide determination," our "desired objective is best served by refusing to entertain" the issue. *Manwill v. Oyler*, 361 P.2d 177, 178 (Utah 1961); *cf.* UTAH R. APP. P. 5(g) ("An appeal from an interlocutory order may be granted only if it appears that the order involves substantial rights and may materially affect the final decision or that a determination of the correctness of the order

before final judgment will better serve the administration and interests of justice.").

¶222 Here, resolving Count V may well obviate the need to address Counts I through IV. In the event Plaintiffs prevail on their claim that S.B. 200 violates the people's right to alter or reform their government via citizen initiative, the act enacted by Proposition 4, UTAH CODE §§ 20A-19-101 to -301 (2018), would become controlling law. And under Proposition 4, if the facts alleged by Plaintiffs are proven true, it is likely that the Congressional Map cannot stand. Plaintiffs allege that Defendants did not comply with the procedural requirements of Proposition 4 in various ways. For instance, they allege that the Legislature did not make its proposed redistricting plan available to the public "for a period of no less than 10 calendar days" before being adopted, *id.* § 20A-19-204(4) (2018); nor "issue to the public a detailed written report" within "seven calendar days after its enactment[,] . . . setting forth the reasons for rejecting" the Commission's proposed redistricting plans or "a detailed explanation of why the redistricting plan enacted . . . better satisfies the redistricting standards and requirements" in Proposition 4, *id.* § 20A-19-204(5)(a) (2018). And the core of Plaintiffs' Complaint is that the Congressional Map is the result of partisan gerrymandering, which is prohibited by Proposition 4. *See id.* § 20A-19-103(3) (2018). So, if Plaintiffs can prove that the Congressional Map was influenced by partisan gerrymandering, that would render the Map invalid as well. Further, Proposition 4's procedural requirements and prohibition on partisan gerrymandering, along with the redistricting criteria itself, are enforceable through a private right of action—which Plaintiffs have suggested they may bring as an amended claim on remand in the event that Count V is reinstated. *See id.* § 20A-19-301 (2018). In other words, to the extent Plaintiffs can establish their claim under Count V, there is a strong chance the courts will not need to address whether the Congressional Map violates the discrete constitutional provisions set out in Counts I through IV— which are precisely the type of issues we try to avoid on interlocutory review. *See Manwill*, 361 P.2d at 178 (explaining that interlocutory review is less appropriate where the issues "may become moot").

¶223 Also, as a general matter of judicial restraint, we "avoid addressing a constitutional issue unless required to do so." *State v. Wood*, 648 P.2d 71, 82 (Utah 1982); *see also Utah Stream Access Coal. v. VR Acquisitions, LLC*, 2019 UT 7, ¶ 55, 439 P.3d 593.

¶224 We are further persuaded that we should determine whether Utahns' chosen solution to partisan gerrymandering should be given effect before applying judicial standards to the Congressional Map. As the U.S. Supreme Court explained in *Rucho v. Common Cause*, 588 U.S. 684 (2019), its conclusion that partisan gerrymandering claims are nonjusticiable in federal court would not "condemn complaints about districting to echo into a void" because "[t]he States . . . are actively addressing the issue on a number of fronts." *Id.* at 719. This included state efforts to stop partisan gerrymandering through constitutional amendments and legislation. *Id.* at 719–20 (highlighting Florida's "Fair Districts Amendment," Colorado and Michigan's "constitutional amendments creating multimember commissions that will be responsible in whole or in part for creating and approving district maps for congressional and state legislative districts," Missouri's creation of a "state demographer" to draw electoral maps, and legislation in Iowa and Delaware prohibiting partisan gerrymandering).

¶225 Proposition 4 was one such effort. Utahns used their legislative power to "actively address[]"partisan gerrymandering comprehensively, by completely prohibiting the practice, reforming the redistricting process as a whole, establishing neutral redistricting criteria, and providing an enforcement mechanism. And while the constitutional provisions Plaintiffs invoke in Counts I through IV might impose limitations on partisan gerrymandering, Proposition 4 completely prohibits the practice, and its method of doing so is comprehensive and detailed. We owe it to the people of Utah to determine, first and foremost, whether their selected method of addressing partisan gerrymandering should set the governing legal standards.

¶226 Although we do not reach Counts I through IV, we will retain jurisdiction over them and stay those claims pending resolution of Count V. If those claims are not mooted, we will address the Defendants' appeal of the district court's rulings on Counts I through IV. But for the foregoing reasons, we decline to do so at this time.

## CONCLUSION

¶227 We hold that the people's right to alter or reform the government through an initiative is constitutionally protected from government infringement, including legislative amendment, repeal, or replacement of the initiative in a manner that impairs the

reform enacted by the people. Thus, an alleged violation of the people's exercise of these rights presents a legally cognizable claim on which relief may be granted. Accordingly, we reverse the dismissal of Count V. We do not address the district court's ruling on Counts I through IV of the Complaint because those claims may become moot depending on the ultimate resolution of Count V. We retain jurisdiction over Defendants' appeal of the district court's decision on those claims. And we remand this case, with Count V intact, to the district court for further proceedings consistent with this opinion.

––––––––––––

APPENDIX

The Independent Commission's Proposed Maps

